[Civ. No. 45495. First Dist., Div. One. Nov. 24, 1982.]

WALTER D. KOLLING et al., Plaintiffs and Respondents, v.
DOW JONES & COMPANY, INC., et al., Defendants and Appellants.

COUNSEL

Cooper, White & Cooper, William J. Dowling III, John D. Mahoney, John M. Ross, Robert D. Sack and Patterson, Belknap, Webb & Tyler for Defendants and Appellants.

G. Joseph Bertain, Jr., Timothy H. Fine and Patrick J. Carter for Plaintiffs and Respondents.

OPINION

**NEWSOM, J.**—Respondents brought an action against appellants for 1) "Interference with Advantageous Business and Contractual Relations," and 2) violations of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). The tort action was abandoned after the trial court's ruling that the damages sought by it were *de minimis*. The Cartwright Act antitrust case proceeded to jury trial, after which a verdict and judgment in favor of respondents Kolling and Fisher in the amounts of $102,915.23 and $62,471.89, respectively, were entered.

Two separate claims comprise the antitrust action which is the subject of the appeal. The primary theory of recovery is the "business claim," the essence of which is that appellants terminated respondent Kolling's newspaper distributorship, refused to recognize and honor an agreement by which the distributorship was transferred to respondent Fisher, and failed to hire Fisher as a replacement distributor, for reasons which amounted to a conspiracy to restrain trade. The secondary action is brought by Kolling alone, and is designated the "territorial restriction claim." In it, Kolling argues that respondents reduced the territory of his distributorship in 1973 in violation of the Cartwright Act.

In salient part the factual background is as follows.

Respondent Walter Kolling, a newspaper distributor since 1947, entered into an oral agreement with Dow Jones & Company (hereafter Dow Jones), publisher of, inter alia, the Wall Street Journal (hereafter WSJ) and Barron's National Business and Financial Weekly (hereafter Barron's), to distribute its publications in the San Francisco Bay Area. Kolling did not pay Dow Jones for his appointment as an exclusive distributor. The agreement between Kolling

and Dow Jones called for the former to purchase publications from the latter and resell them through vending machines, retail outlets, and home and office delivery to subscribers.

During the 1960's, Kolling expanded his area of sales as far south as San Jose. Gradually, however, Dow Jones deleted certain areas from the territory served by Kolling; first Palo Alto, then the East Bay from Richmond to the Oakland Airport, then San Jose. By 1967, Kolling's service area was confined to the area from Millbrae north to San Francisco. Kolling protested each "realignment" in his territory to no avail.

The record shows that during the 1960's and early 1970's Dow Jones sales representatives requested on several occasions that Kolling attempt to convince uncooperative retailers of the WSJ to sell the newspapers at the retail price suggested by Dow Jones.[1] Kolling was apparently only successful at persuading the Palace Hotel in San Francisco to roll back its price of the WSJ to the suggested figure.

Dow Jones also practiced a policy of seeking to enforce price schedules among its distributors, as the following evidence reveals.

In 1971, appellant Paul Smith was hired by Dow Jones as a field service representative, and in that capacity worked with Dow Jones distributors in the San Francisco Bay Area. He reported to the Dow Jones Western Regional Manager, a position held by appellant Jeff Williams beginning in mid-1972.

When he was hired, Smith received a copy of the Dow Jones Retail Sales Manual, which explained the procedure to be employed upon a change of distributorships. The manual recommended that a new distributor be informed by letter of the following: "(1) The distributorship is terminable at will by either party at any time for any reason up to 30 days prior written notice . . . "; and (2) "In accordance with our *historical policy,* Dow Jones further reserves the right to refuse to deal with any distributor who will not abide by our suggested retail price schedules as issued from time to time by the Company." (Italics added.) According to testimony offered by Dow Jones, the form letter stating the company's "historical policy" on overpricing was removed from the retail sales manual on October 7, 1974, by a written directive which mentioned a request by the Dow Jones Legal Department to "refrain from using the confirmation of appointment letter. . . ."

---

[1] At that time, a Dow Jones Retail Sales Manual reflected the company policy, which sought to prevent overpricing—sale of publications at greater than the cover price listed by Dow Jones—by retailers.

Respondent Fisher testified that during one of his first meetings with a Dow Jones representative in 1971—to discuss Fisher's interest in distributing the WSJ in the East Bay—he was told, in a "threatening" tone, that Dow Jones "strongly urged" its distributors to adhere to the cover price for rack sales.

Other distributors encountered difficulties with Dow Jones for selling publications at prices greater than the suggested retail price.

In 1971, and again in May or June of 1974, distributor Herman Overdevest exceeded the cover price for Dow Jones publications in his territory and was asked to comply with suggested rate structure by Dow Jones representatives. On the latter occasion, appellant Smith warned Overdevest to roll back his prices; feeling intimidated, Overdevest reluctantly complied. In a subsequent letter to Williams, Smith noted his meeting with Overdevest and the distributor's promise to adhere to the rate structure, and explained that he would "be checking to be sure [Overdevest] follows up on his promise." On later occasions, Overdevest again raised his rates above the suggested price with Dow Jones' knowledge, without response from the publisher.

In April 1974, Dow Jones discovered that one of its Sacramento distributors, Ralph Marston, was engaged in "overpricing." Dow Jones immediately contacted Marston and asked to meet with him to discuss his "plans for pricing on our publications as it relates to our proposed expansion/promotional efforts in Sacramento." When, after a meeting on April 8, Marston failed to assure Dow Jones that he would comply with the suggested price schedule, appellant Williams advised his superiors that Marston should be terminated. Marston was terminated by letter dated May 30, 1974. Internal Dow Jones memoranda strongly suggest that the unannounced reason for Marston's termination was his overpricing.[2] Dow Jones thereafter reconsidered the legality of its action, rescinded its notice of termination, and reemployed Marston.

In 1973, John Wilhalm, the Dow Jones distributor in San Mateo County, and Kolling's successor in that territory, sold the WSJ to a large airport newsstand at prices higher than suggested by Dow Jones (and higher than the rate previously charged by Kolling). The newsstand complained to Dow Jones, and Wilhalm was told that he should roll back his prices to avoid loss of the account. He reluctantly complied.

---

[2]A memorandum sent to Williams, dated May 15, 1974, is illustrative; it explained: "The problem of overpricing in Sacramento by Ralph Marston has not changed. I have personally answered the two letters directed to Mr. Phillips regarding the situation. [¶] I have also discussed the problem with Mark Peterson on several occasions and Mark agrees with me that our only recourse to solve the problem is to terminate Ralph Marston giving him a 30-day notice. Obviously, the price situation would play no part in our conversation with Marston."

In a cable wherein Williams expressed his frustration at the length of time needed to dispose of Marston, he added: "Should Marston create this much thought processes, indeed, what will take place when we eliminate Mr. Kolling and Mr. Vlaco?"

Several instances of territorial restrictions imposed by Dow Jones upon distributors were also established at trial, as follows.

First, respondents introduced into evidence a letter written by respondent Smith to a WSJ customer which explained that Dow Jones distributors sell publications within "specific areas" assigned in accordance with written agreements which "are binding in the sense that we cannot allow retail, vending machines or home delivery distribution of our papers by anyone other than our authorized distributors in any area where such an agreement has been made."

Respondent Kolling was also involved in several disputes over his distributorship territory, which was reduced in size gradually during the 1960's and early 1970's against Kolling's wishes.

Then, between 1972 and 1975, Smith and Williams became dissatisfied with Kolling's performance as a distributor. According to their testimony, Kolling's deficiencies included the following: vending machines left in poor condition, and without state-required labels; late deliveries, customer complaints; unavailability for weekly contacts with sales representatives and general uncooperativeness; and failure to purchase and install racks at suggested locations. (Kolling offered his own testimony in rebuttal, in which he explained the reasons for his delivery times and rack locations, and complained of the inexperience of Smith and Williams in the San Francisco market.)

In response to its dissatisfaction with Kolling, Dow Jones notified him by letter from Williams dated March 20, 1973, that San Mateo County would be eliminated from his distributorship territory, leaving only San Francisco as his area of responsibility. According to Dow Jones, the reduction in Kolling's service area was effectuated to give him a more manageable distribution territory. Kolling again objected to the territorial split, but the letter from Williams warned: "It is expected that you will honor this territorial realignment."

Kolling did not completely abide by the territorial split. But, when he continued to serve his airline accounts at San Francisco International Airport, Williams warned that Dow Jones would either cut his draw—the number of papers sold to Kolling each day for distribution—or further reduce his territory.

Dow Jones apparently felt that Kolling's performance had not improved despite the reduction in his service area, and so began the search for a replacement. Respondent Fisher, a *San Francisco Chronicle* distributor in the East Bay, was one of the potential replacements interviewed by Smith. In response to Smith's inquiries, Fisher mentioned that he would be willing to divest himself of his Chronicle distributorship "if the situation dictated."

Meanwhile, Kolling had incurred the further displeasure of Dow Jones by supplying a recently terminated distributor, Sol Lester, with publications for distribution in the Los Gatos-Saratoga area. On July 25, 1974, Williams met with Kolling and advised him that "we had established boundaries and he should respect these boundaries and should not sell papers to people outside his territory, especially in an area where we have an established wholesaler." Kolling ignored this admonition and continued to supply Lester with publications; Dow Jones responded by reducing Kolling's draw by 100 papers.

On August 2, 1974, Smith and Fisher again met and specifically discussed the San Francisco distributorship. Fisher indicated his interest in the position, and Williams mentioned that he was one of the people under consideration to replace Kolling. Some of the details of the distributorship position were discussed, including Williams' view that the WSJ should be sold at the suggested retail price (of 20 cents) from vending machines.[3] Fisher admitted to Williams that he sold Chronicles for more than the suggested retail price. At Williams' request, Fisher agreed to keep the meeting confidential.

After the meeting with Williams, Fisher harbored ethical doubts about assuming a distributorship without the knowledge or consent of the incumbent distributor, and so, despite the representation to Williams that he would keep their meeting confidential, discussed the matter with his attorney. Subsequently, Fisher contacted Kolling,[4] and after negotiations, a written agreement between the two for the sale of the distributorship by Kolling to Fisher was executed on September 9, 1974 (hereafter the agreement).

By the terms of the agreement, Kolling agreed to sell Bay News Company (under which name he had been doing business) to Fisher effective January 1, 1975. The assets sold included trucks, vending machines and other tangible items, and also such intangibles as subscriber lists and the trade name "Bay News Company." The agreement also purported to sell Kolling's "rights and interest to the hauling, distribution and resale of The Wall Street Journal, National Observer, Barrons and California Business."

Kolling and Fisher each wrote a letter to Williams advising him of the agreement and of Fisher's intended assumption of the distributorship on January 1, 1975. Dow Jones decided to treat the agreement and Kolling's letter as an announcement of his resignation. In letters subsequently sent by Williams to Kolling, Dow Jones explained its position that the agreement between Kolling and Fisher would not be honored for the reason that distribution rights were not saleable. Williams told Fisher of this development at a meeting on September

---

[3]Williams mentioned that the home delivery rate "was up to the dealer."

[4]Kolling first learned of his impending termination when he was contacted by Fisher.

13, 1974, but assured the latter he was still under consideration for the distributorship being vacated by Kolling.

On November 29, 1974, Dow Jones mailed Kolling a formal notice of termination effective January 1, 1975. On the same date, Williams admitted to Mrs. Kolling that Fisher was no longer under consideration as a replacement. Ultimately, John Wilhalm was selected and accepted the San Francisco distributorship.

Kolling was determined to stay in business, at least to the extent of serving his prime office accounts, and obtained newspapers for this purpose from Overdevest, who, having thereby increased his sales, requested certain draw increases. At the same time, Kolling increased his selling price to 30 cents—higher than the suggested price of 25 cents. Overdevest received approximately 50 percent of the draw increase he requested, which was significantly less than the increase customarily granted under such circumstances.

Kolling continues to sell Dow Jones publications to some of his office customers, and thereby earns a monthly income approximately equal to his expected income from the agreement with Fisher.

Appellants complain that the evidence supportive of the Cartwright Act cause of action is insufficient as a matter of law. They also argue that certain instructions given to the jury were without evidentiary basis and hence prejudicial.

The Cartwright Act is contained in Business and Professions Code section 16700 et seq. Sections 16720 and 16726 generally codify the common law prohibition against restraint of trade. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953].) An unlawful trust is defined in section 16720 as "*a combination of capital, skill or acts by two or more persons*" (italics added) for enumerated purposes which restrains trade. Section 16726 declares that "every trust is unlawful, against public policy and void." Section 16750, subdivision (a), confers a private right of action for treble damages and attorneys' fees on "Any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, . . . "

The Cartwright Act is patterned after the federal Sherman Anti-Trust Act (15 U.S.C. § 1 et seq.), so that decisions under the latter act are applicable to the former. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d 842, 852; *Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 19 [126 Cal.Rptr. 327].)

■ In order to maintain a cause of action for a combination in restraint of trade pursuant to either the Cartwright or Sherman Acts, the following elements must be established: (1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts. (*Saxer* v. *Philip Morris, Inc.*, *supra*, 54 Cal.App.3d 7, 20.) Whether each element has been established is a question of fact to be determined by the trier of fact. (*Id.*, at p. 23.) Accordingly, on appeal this court is bound by the substantial evidence rule, and every intendment or presumption must be indulged in favor of the judgment. (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].)

Appellants first argue that respondents are precluded from any recovery under the Cartwright Act because Kolling's distributorship was terminable at will; having had no ownership interest in the distributorship, he cannot complain of his termination by Dow Jones. As a corollary proposition, appellants suggest that Fisher can bring no antitrust claim as a rejected prospective distributor; since neither respondent had a legally recognizable interest in the distributorship, the refusal of Dow Jones to honor the agreement between them cannot have created an actionable antitrust claim.

■ It is well established that an agreement creating an exclusive distributorship is, absent a provision requiring cause for termination, terminable by the supplier at will. (*International Aerial Tramway Corp.* v. *Konrad Doppelmayr & Sohn* (1969) 70 Cal.2d 400, 404 [74 Cal.Rptr. 908, 450 P.2d 284]; *Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 726-727 [73 Cal.Rptr. 213, 447 P.2d 325].) Such an agreement may be terminated by the supplier upon reasonable notice without giving rise to a cause of action for breach of contract. (*Weissensee* v. *Chronicle Publishing Co.* (1976) 59 Cal.App.3d 723, 727 [129 Cal.Rptr. 188]; *Noble* v. *McClatchy Newspapers* (9th Cir. 1975) 533 F.2d 1081, 1085-1086.)

Thus, in *Noble, supra*, an independent newsstand distributor for the Sacramento Bee operated under a contract which provided that he could sell his distributorship subject to the publisher's approval. After he received notice of termination, Noble's request and attempt to sell his distributorship was denied by McClatchy. Noble's antitrust action was deemed unsupported because, upon termination of the agreement, the distributor owned nothing more than the legally worthless "contractual right to distribute the Bee for thirty-odd days." (533 F.2d at p. 1085.) Consequently, the court concluded, the distributor could have suffered no damages from the termination. (*Id.*, at pp. 1085-1086.)

Appellants insist that *Noble* is dispositive here. They also rely upon the often-cited general rule that "a manufacturer may discontinue dealing with a particular distributor 'for business reasons which are sufficient to the manufac-

turer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade.'" (*Bushie* v. *Stenocord Corporation* (9th Cir. 1972) 460 F.2d 116, 119 citing *Richetti* v. *Meister Brau, Inc.* (9th Cir. 1970) 431 F.2d 1211, 1214.) As explained in *Fuchs Sugars & Syrups, Inc.* v. *Amstar Corp.* (2d Cir. 1979) 602 F.2d 1025, 1030, citing *Bowen* v. *New York News, Inc.* (2d Cir. 1975) 522 F.2d 1242, 1254, "'[w]here a manufacturer simply decides on his own to substitute one dealer for another, and cuts off the former dealer, his decision to sell exclusively to a new dealer does not amount to an antitrust "conspiracy" with the latter [citations omitted], even though the manufacturer has agreed with the new dealer to transfer patronage to him and to terminate sales to the former dealer.'"

It is also the law, however, that the refusal of a manufacturer to deal with a distributor can constitute a "combination" in restraint of trade within the purview of the Sherman Act. (*Albrecht* v. *Herald Co.* (1968) 390 U.S. 145 [19 L.Ed.2d 998, 88 S.Ct. 869]; *United States* v. *Parke, Davis & Co.* (1960) 362 U.S. 29 [4 L.Ed.2d 505, 80 S.Ct. 503]; *Guild Wineries & Distilleries* v. *J. Sosnick & Son* (1980) 102 Cal.App.3d 627, 633 [162 Cal.Rptr. 87].) While a producer may normally choose its distributors, cancellation of a distributorship for anticompetitive reasons violates the antitrust laws and is thus actionable. (*Albrecht* v. *Herald Co., supra,* 390 U.S. at p. 150 [19 L.Ed.2d at p. 1002]; *Fuchs Sugars & Syrups, Inc.* v. *Amstar Corp., supra,* 602 F.2d 1025, 1031-1032; *Industrial Bldg. Materials, Inc.* v. *Interchemical Corp.* (9th Cir. 1970) 437 F.2d 1336, 1341.) As noted in *Alpha Distrib. Co. of Cal., Inc.* v. *Jack Daniel Distillery* (9th Cir. 1972) 454 F.2d 442, 452, "[t]he critical inquiry in such 'refusal to deal' cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose and effect, or both, as to be an unreasonable restraint of trade." Accordingly, our task is to determine whether the evidence supports the jury's finding that Dow Jones' termination of Kolling and its refusal to deal with Fisher were motivated by anticompetitive reasons and so resulted in a restraint of trade. (*Ibid.*; see also *Joseph E. Seagram & Sons, Inc.* v. *Hawaiian Oke & Liquors, Ltd.* (9th Cir. 1969) 416 F.2d 71, 77-78.)

In our view, neither the holding in *Noble* nor the terminable nature of the distributorship defeat respondents' antitrust action. It is instead dependent upon evidence of a conspiracy and an anticompetitive purpose and effect behind the termination. (*R. E. Spriggs Co.* v. *Adolph Coors Co.* (1979) 94 Cal.App.3d 419, 424 [156 Cal.Rptr. 738]; *Witt* v. *Union Oil Co.* (1979) 99 Cal.App.3d 435, 441 [160 Cal.Rptr. 285].)

Appellants contend that neither "conspiracy" nor a "combination" to restrain trade was established at trial because, as a matter of law, Dow Jones

was legally incapable of conspiring with itself or its agents, while no other parties to the conspiracy were established.

The Cartwright Act, like the Sherman Act, requires an illegal "combination" or "conspiracy" to restrain trade. (Bus. & Prof. Code, § 16720; *H. L. Moore Drug Exchange* v. *Eli Lilly and Co.* (2d Cir. 1981) 662 F.2d 935, 941.) Unilateral refusal by a producer to deal with a distributor, absent proof that it was pursuant to an illegal conspiracy, does not violate the antitrust laws. (*United States* v. *Colgate & Co.* (1919) 250 U.S. 300 [63 L.Ed. 992, 39 S.Ct. 465, 7 A.L.R. 443]; *Oreck Corp.* v. *Whirlpool Corp.* (2d Cir. 1980) 639 F.2d 75.) And, as appellants suggest, a corporation cannot conspire with itself or its agents for purposes of the antitrust laws. (*Bondi* v. *Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672, 677-678 [73 Cal.Rptr. 494]; *Fuchs Sugars & Syrups, Inc.* v. *Amstar Corp., supra,* 602 F.2d 1025, 1030-1031.)

But it is also now established that the "conspiracy" or "combination" necessary to support an antitrust action can be found where a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere. (*Reed Bros. Inc.* v. *Monsanto Company* (8th Cir. 1975) 525 F.2d 486, 495 cert. den. 423 U.S. 1055 [46 L.Ed.2d 645, 96.S.Ct. 787]; *Osborn* v. *Sinclair Refining Company* (4th Cir. 1963) 324 F.2d 566, 571-573; *Jacobson & Co., Inc.* v. *Armstrong Cork Co.* (S.D.N.Y. 1977) 433 F.Supp. 1210, 1213, fn. 17.) If a "single trader" pressures customers or dealers into adhering to resale price maintenance, territorial restrictions, exclusive dealing arrangements or illegal "tieins," an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a producer to determine with whom it will deal. (*Albrecht* v. *Herald Co., supra,* 390 U.S. 145, 149 [19 L.Ed.2d 998, 1001-1002]; *United States* v. *Parke, Davis & Co., supra,* 362 U.S. 29, 44-45 [4 L.Ed.2d 505, 515]; *R. E. Spriggs Co.* v. *Adolph Coors Co., supra,* 94 Cal.App.3d 419, 425; *Osborn* v. *Sinclair Refining Co.* (4th Cir. 1963) 324 F.2d 566, 573; *Crown Central Petroleum Corp.* v. *Brice* (E.D.Va. 1977) 427 F.Supp. 638, 640; *United States* v. *O. M. Scott & Sons Company* (D.D.C. 1969) 303 F. Supp. 141, 153.)

And so the crucial question in the case before us is whether the evidence supports a finding that Dow Jones coerced its distributors, including Kolling, in a manner constituting a restraint on trade.

Appellants insist that the evidence of coercion offered by respondents was insufficient to support any restraints on trade alleged by respondents.[5] We disagree.

---

[5]The following anticompetitive restraints were asserted by respondents: 1) maximum price-setting; 2) territorial restrictions; and 3) exclusive dealing arrangements.

If a seller does no more than announce a policy designed to restrain trade, and declines to sell to those who fail to adhere to the policy, no illegal combination is established. (*United States* v. *Parke, Davis & Co., supra,* 362 U.S. 29, 44 [4 L.Ed.2d 505, 515]; *Osborn* v. *Sinclair Refining Co., supra,* 324 F.2d 566, 573.) Also, a supplier may suggest policies and use persuasion to obtain adherence. (*Hanson* v. *Shell Oil Co.* (9th Cir. 1976) 541 F.2d 1352, 1357, fn. 4; *Gray* v. *Shell Oil Co.* (9th Cir. 1972) 469 F.2d 742, 746.) At the same time, an illegal combination may be found where a supplier secures compliance with announced policies in restraint of trade by means which go beyond mere announcement of policy and the refusal to deal. (*United States* v. *Parke, Davis & Co., supra,* 362 U.S. 29, 44 [4 L.Ed.2d 505, 515]; *Aladdin Oil Co.* v. *Texaco, Inc.* (5th Cir. 1979) 603 F.2d 1107, 1113-1114.) If, for example, the supplier takes "affirmative action" to bring about the involuntary acquiescence of its dealers, an unlawful combination exists. (*United States* v. *Parke, Davis & Co., supra,* 362 U.S. 29, 44 [4 L.Ed.2d 505, 515]; *Adolph Coors Co.* v. *F. T. C.* (10th Cir. 1974) 497 F.2d 1178, 1185; *United States* v. *O. M. Scott & Sons Co., supra,* 303 F.Supp. 141, 153.)[6]

Here, respondents charged appellants with *price fixing* as one form of unlawful coercive conduct in restraint of trade. And since the jury found the allegation of price fixing to be true, we are bound to accept its finding if—viewing the record in its entirety—it contains substantial evidence in support of that finding. (*Adolph Coors Co.* v. *F. T. C., supra,* 497 F.2d 1178, 1184.)

Under both California and federal antitrust law, price fixing is illegal per se, so that *any* combination which tampers with price structures constitutes an unlawful activity. *U.S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 218, 221 [84 L.Ed. 1129, 1165, 1167, 60 S.Ct. 811]; *Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376 [143 Cal.Rptr. 1, 572 P.2d 1142].) " 'The "per se" doctrine means that a particular practice and the setting in which it occurs is sufficient to compel the conclusion that competition is unreasonably restrained and the practice is consequently illegal.' " (*Oakland-Alameda County Builders Exchange* v. *F. P. Lathrop Constr. Co.* (1971) 4 Cal.3d 354, 361 [93 Cal.Rptr. 602, 482 P.2d 226].)[7] Accordingly, as noted in *Adolph Coors Co.* v. *F. T. C.,*

---

[6]In *Adolph Coors Co.* v. *F. T. C., supra,* 497 F.2d at page 1185, the court noted that, "[a]ny trespass on the independence of a reseller or wholesaler to set his own prices is a violation of the Sherman Act."

[7]In *Oakland-Alameda County Builders Exchange* v. *F.P. Lathrop Constr. Co., supra,* the court declared: "Under both California and federal law, agreements fixing or tampering with prices are illegal per se. The principle was stated clearly by the United States Supreme Court: '[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. . . . Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized

*supra,* 497 F.2d 1178, 1184, citing *Pearl Brewing Co.* v. *Anheuser-Busch, Inc.* (S.D.Tex. 1972) 339 F.Supp. 945, 952: "[T ]he test . . . is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment, and not what the particular effect the agreement or conduct, has on the actual prices."

██ Here, respondents established that Dow Jones had a definitive pricing policy. The company dealt with "dissident" distributors by strongly suggesting a price roll back. Given the company's vastly superior bargaining strength, such "suggestions" were in fact thinly disguised and threatening commands. And plainly, as illustrated by the cases of Overdevest and Wilhalm, some distributors unwillingly lowered their price schedules to adhere to the Dow Jones policy. We find ample evidence in the record that at least one distributor, Marston, was terminated because of his refusal to adhere to Dow Jones' pricing policy. And, while the evidence is in conflict, a reasonable inference therefrom is that Kolling's termination was prompted at least in part by his noncompliance with pricing and territorial policies.

When viewed as it must be in the light most favorable to the judgment below (*Fair Employment Practice Com.* v. *State Personnel Bd.* (1981) 117 Cal.App.3d 322, 333 [172 Cal.Rptr. 739]; *H. L. Moore Drug Exchange* v. *Eli Lilly and Co.*, *supra,* 662 F.2d 935, 937, 940), the evidence of coercive conduct and price fixing is substantial and convincing. Two factors persuade us. First, the potential short term of the distributorship together with Dow Jones' ability to cancel or reduce the distributor's territory without cause, create an inherently coercive atmosphere. (*Phillips* v. *Crown Central Pet. Corp.* (4th Cir. 1979) 602 F.2d 616, 627.) Second, the significant value of the distributorship tends to show that distributors would be particularly subject to economic coercion. (*Adolph Coors Co.* v. *F. T. C.*, *supra,* 497 F.2d 1178, 1182.) And, when this evidence is viewed in the light of Dow Jones' price-fixing policy and the intimidating "suggestions" made to recalcitrant distributors, we think it sufficient to support inferences of coercion and price fixing. (*Phillips* v. *Crown Central Petroleum Corp.*, *supra,* 602 F.2d at p. 627; *Adolph Coors Co.* v. *F. T. C.*, *supra,* 497 F.2d at p. 1185.) The same evidence also suggests, in our view, that the price-fixing scheme continued to the date of Kolling's termination.

Particularly persuasive in this respect is the case of *R. E. Spriggs* v. *Adolph Coors Co.*, *supra,* 94 Cal.App.3d 419, where this court found evidence of price

prices they would be directly interfering with the free play of market forces. The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference.' [Citation.]" (4 Cal.3d at p. 363.)

fixing by Coors in its dealings with beer distributors. The following factors were cited in support of a finding of coercive conduct: the valuable but fragile nature of the distributorship, which was terminable without cause on 30 days' notice; territorial restrictions imposed upon the distributors; a policy of price maintenance enforced by Coors' staff of field representatives who "made suggestions as to such prices and attempted to persuade the distributors to follow them." (*Id.*, at p. 424.) Much the same evidence obtains in the case at bench, and we accordingly conclude that the scheme of price fixing by coercive conduct directed by Dow Jones at its distributors is supported by substantial evidence.[8]

■ Appellants next argue that respondents did not suffer legally cognizable damages. They rely on the premise that the distributorship had no value, and reason from this that neither Kolling nor Fisher could place reasonable reliance upon Dow Jones' recognition of the agreement under which the distributorship was transferred to Fisher.

The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries. (*Saxer* v. *Philip Morris, Inc.*, *supra*, 54 Cal.App.3d 7, 22.) The frequently stated "standing to sue" requirement is merely a rule that an action for violation of the antitrust laws may be maintained only by a party within the "target area" of the antitrust violation, and not by one incidentally injured thereby. (*Id.*, at p. 26; *Program Engineering* v. *Triangle Publications* (9th Cir. 1980) 634 F.2d 1188, 1191.) An "antitrust injury" must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful. (*Brunswick Corp.* v. *Pueblo Bowl-O-Mat., Inc.* (1977) 429 U.S. 477, 487-489 [50 L.Ed.2d 701, 711-713, 97 S.Ct. 690];[9] *Sol-*

---

[8]In light of this conclusion, we find it unnecessary to decide whether respondents' "business claim is supported by evidence of unreasonable territorial or exclusive dealership restraints."

Even if neither the territorial restriction nor exclusive dealing practices can support the judgment, the jury verdict may be upheld on the price-fixing theory. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673-674 [117 Cal.Rptr. 1, 527 P.2d 353].) General verdict forms were presented to the jury, so we do not know upon which theory the verdict was based.

For the same reason, we find it unnecessary to discuss the merits of the "territorial restriction claim."

[9]In *Brunswick,* the Supreme Court was faced with the problem of whether a certain injury to a business fell within the protection of the antitrust laws. Brunswick Corp. is a giant in the bowling industry and had acquired some defaulting bowling centers in the plaintiffs' market area. These centers were defaulting on payments owed for bowling equipment purchased from Brunswick. Had the centers been allowed to close, plaintiffs' business and profit would have increased due to a higher share of the market. Plaintiffs alleged that Brunswick's acquisition of the defaulting bowling centers might substantially lessen competition in violation of § 7. They sought treble damages for lost profits under § 4. A jury awarded damages and the trial court trebled them. The Supreme Court reversed, finding that: "It is inimical to the purposes of these laws to award damages for the type of injury claimed here." (429 U.S. 477, 488 [50 L.Ed.2d 701, 712].)

*inger* v. *A & M Records, Inc.* (9th Cir. 1978) 586 F.2d 1304, 1310.) Finally, a plaintiff must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions. (*Id.,* at p. 1310; *John Lenore & Co.* v. *Olympia Brewing Co.* (9th Cir. 1977) 550 F.2d 495, 499.)

The antitrust laws are designed to protect the public, as well as more immediate victims, from a restraint of trade or monopolistic practice which has an anticompetitive impact on the market. (*Simpson* v. *Union Oil Co.* (1964) 377 U.S. 13, 16 [12 L.Ed.2d 98, 101-102, 84 S.Ct. 1051]; *People* v. *National Association of Realtors* (1981) 120 Cal.App.3d 459, 478 [174 Cal.Rptr. 728].) Thus, the antitrust laws allow private enforcement by an aggrieved party, even if the complainant be but a single merchant. (*Simpson* v. *Union Oil Co., supra,* at p. 16 [12 L.Ed.2d at pp. 101-102].)

We are persuaded that respondents suffered the type of injury which the antitrust laws seek to prevent. As said in *Lee-Moore Oil Co.* v. *Union Oil Co.* (4th Cir. 1979) 599 F.2d 1299, 1303, "the case will be quite rare in which a *per se* violation of the Sherman Act [such as price-fixing] does not cause competitive injury."

Applying these criteria to the instant record, we think the termination of Kolling's distributorship and Dow Jones' refusal to recognize Fisher as a replacement distributor resulted directly from the price-fixing scheme and the publisher's attempts to further it. Respondents' injuries, therefore, were not "secondary," "consequential," or "remote," but the direct result of the unlawful conduct. (*Saxer* v. *Philip Morris, Inc., supra,* 54 Cal.App.3d 7, 26.) Consequently, respondents have shown an injury caused by reason of conduct which the antitrust laws seek to prevent. (*Lee-Moore Oil Co., supra,* 599 F.2d 1299, at p. 1304; *Blankenship* v. *Hearst Corporation* (9th Cir. 1975) 519 F.2d 418, 426; *Osborn* v. *Sinclair Refining Co., supra,* 324 F.2d 566, 571.)

Appellants' further contention that no "antitrust injury" is shown because Kolling had no contractual right to a continuation of his distributorship, is meritless. Substantial evidence shows that Kolling was terminated and Fisher rejected for reasons which amount to a restraint on trade, thereby establishing the antitrust violation which caused injury in the instant case. (*Mulvey* v. *Samuel Goldwyn Productions* (9th Cir. 1970) 433 F.2d 1073, 1075-1076.)

■ Appellants argue further that the damages awarded were excessive, and make the following specific contentions.

First, they submit that the trial court misconceived its duty and denied the motion for a new trial for the erroneous reason that it felt bound by the jury's

determination and verdict. In support of this argument, they rely upon two cases—*People* v. *Robarge* (1953) 41 Cal.2d 628 [262 P.2d 14] and *Lippold* v. *Hart* (1969) 274 Cal.App.2d 24 [78 Cal.Rptr. 833]—in which it was held that the trial court failed to give the moving party the benefit of an independent review of the evidence in ruling on the motion for a new trial. In both cases, appellants contend, it was evident that the trial court felt inclined to reverse the jury verdict but failed to do so only because of its misconception that the jury verdict was binding.

The present case is distinguishable from both *Robarge* and *Lippold*. The trial judge here found some of the evidence in support of the verdict to be of questionable credibility, but never opined that he had no authority to act contrary to the jury verdict. In fact, he found "no evidence to the contrary." Nowhere do we find plausible indications that the judge could not find sufficient credible evidence to support the jury's determination.

In *People* v. *Cartwright* (1979) 98 Cal.App.3d 369, at page 381 [159 Cal.Rptr. 543], the court explained: " 'It has been stated that a defendant is entitled to two decisions on the evidence, one by the jury and the other by the court on motion for a new trial. [Citations omitted.] This does not mean, however, that the court should disregard the verdict or that it should decide what result it would have reached if the case had been tried without a jury, but instead that it should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' " The trial court in the present case properly reviewed the evidence, found that some of it lacked credibility but decided that the verdict should not be reversed. He did not, as condemned in *People* v. *Robarge, supra,* 41 Cal.2d 628 and *Lippold* v. *Hart, supra,* 274 Cal.App.2d 24, deny the motion because he felt constrained to abide by the decision of the jury.

Appellants' second argument on damages is that the evidence offered by respondents, and particularly the expert testimony of Mr. Bradwell, was inherently unreliable and unworthy of consideration. They insist that Bradwell's expert testimony was flawed: 1) by his failure to consider the lack of value of Kolling's distributorship and 2) the expenses which would have reduced profits earned by Fisher from operation of the distributorship.

While Bradwell's testimony was contradicted on cross-examination, it was not entirely discredited. More importantly, appellants offered no contrary evidence whatever.

In reviewing a trial court's ruling on a motion for new trial, we will not reweigh the evidence; our power begins and ends with a determination as to

whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. (*Charles D. Warner & Sons, Inc.* v. *Seilon, Inc.* (1974) 37 Cal.App.3d 612, 617 [112 Cal.Rptr. 425].) Here, the evidence of damages—while far from overwhelming—is "substantial." And since the award was not clearly the result of "passion and prejudice," we find no reason to reverse it. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927 [148 Cal.Rptr. 389, 582 P.2d 980].)

■ Appellants also claim that erroneous and prejudicial instructions were given to the jury. They submit that the jury should not have been instructed to consider the territorial restriction and exclusive dealing aspects of respondents' "business claim," because no evidence supported those theories.[10]

It is the established rule that, " 'Even though an instruction is couched in proper language it is improper if it finds no support in the evidence, and the giving of it constitutes prejudicial error if it is calculated to mislead the jury . . . . '" (*Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370 [99 Cal.Rptr. 29, 491 P.2d 821].) But it is also settled that, "A party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may properly be drawn from the evidence." (*Western Decor & Furnishings Industries, Inc.* v. *Bank of America* (1979) 91 Cal.App.3d 293, 309 [154 Cal.Rptr. 287].) Therefore, we must determine if there is "any evidence in the record" from which the jury could have inferred that Dow Jones imposed unlawful territorial and exclusive dealing restraints upon its dealers. (*Solgaard, supra,* 6 Cal.3d at p. 370.)

Territorial restrictions on distributors and exclusive dealing arrangements—whereby dealers are precluded from distributing products other than those furnished by the supplier—are not governed by the "per se" rule. Rather, such trade restraints are tested by the "rule of reason," and are thus unlawful only if found unreasonable. (*Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 45 [53 L.Ed.2d 568, 577, 97 S.Ct. 2549]; *Guild Wineries & Distilleries* v. *J. Sosnick & Son, supra,* 102 Cal.App.3d 627, 634; *American Motor Inns, Inc.* v. *Holiday Inns, Inc.* (3d Cir. 1975) 521 F.2d 1230, 1241.) To prove an exclusive dealing arrangement unlawful, the distributor must show

---

[10]Because of our conclusion that the "business claim" can be upheld on other grounds, it is unnecessary for us to decide whether the record supports the verdict based upon evidence of territorial or exclusive dealership restraints on trade. Nevertheless, the appellants' claim of instruction error in connection therewith requires that we discuss the evidence of territorial and exclusive dealership restrictions to determine the propriety of the challenged instructions.

that it was intended to, or actually did, unreasonably restrain trade. (*A. H. Cox & Co.* v. *Star Machinery Co.* (9th Cir. 1981) 653 F.2d 1302, 1305-1306; *Marquis* v. *Chrysler Corp.* (9th Cir. 1978) 577 F.2d 624, 639-640.)

The "rule of reason" permits certain restraints upon trade to be found reasonable. (*Standard Oil Co. of New Jersey* v. *United States* (1911) 221 U.S. 1, 60 [55 L.Ed. 619, 645, 31 S.Ct. 502]; *People* v. *Building Maintenance Contractors' Assn., Inc.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31].) In order to determine whether the restrictions are reasonable, "the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 38 S.Ct. 242]; *Corwin* v. *Los Angeles Newspaper Services Bureau, Inc., supra,* 4 Cal.3d 842, 854.) "Whether a restraint of trade is reasonable is a question of fact to be determined at trial." (*Id.,* at p. 855.)

Appellants submit that no evidence of territorial restrictions or exclusive dealing arrangements appears in the record, and that assuming arguendo that it does, any such restraints were entirely reasonable.

We find the evidence of *unreasonable* territorial and exclusive dealing restraints sufficient to justify the trial court's instructions.[11] And even if we were to find the criticized instruction to be erroneously given, we would deem the error harmless. "Prejudice appears '[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction. . . . ' " (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946].) Here, the general verdict form submitted to the jury prevents us from knowing which theory the jury relied upon in reaching its verdict on the "business claim." But, the strength of respondents' evidence of price fixing, when compared with that of the other restraint of trade allegations, leads us to conclude that the instructions here at issue did not materially contribute to the verdict. (*Solgaard* v. *Guy F. Atkinson Co., supra,* 6 Cal.3d 361, 471.)

---

[11]We feel that territorial restrictions and exclusive dealing restraints were established, but, for the most part, were motivated by legitimate business concerns rather than an intent to suppress competition. (*Newberry* v. *Washington Post Co.* (D.D.C. 1977) 438 F.Supp. 470, 475.) We conclude, however, that respondents were entitled to have the jury instruction on these theories, since some evidence was offered to support them.

The judgment is affirmed.[12] Respondents Kolling and Fisher awarded costs on appeal.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied December 24, 1982, and appellants' petition for a hearing by the Supreme Court was denied March 2, 1983. Mosk, J., and Kaus, J., were of the opinion that the petition should be granted.

---

[12]In accordance with respondents' concessions, since we affirm the jury verdict on the antitrust action, we need not resolve the issues raised by the cross-appeal from the trial court's ruling that respondents suffered no more than *de minimis* damages by reason of appellants' unlawful interference, if any, with the agreement between Kolling and Fisher for transfer of the distributorship.