**JACK ROWE ASSOC., INC.; Rowe Marketing International, Inc., Plaintiffs–Appellants,**

v.

**FISHER CORPORATION, Defendant–Appellee.**

**No. 86–6243.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1987.

Decided Nov. 27, 1987.

John G. Clancy, Durango, Colo., for plaintiffs-appellants.

Amy D. Hogue, Los Angeles, Cal., for defendant-appellee.

Before GOODWIN, ALARCON and LEAVY, Circuit Judges.

GOODWIN, Circuit Judge:

Plaintiffs-appellants Jack Rowe Associates ("Associates") and Jack Rowe Marketing International ("International") appeal the district court's grant of summary judgment in favor of defendant-appellee Fisher Corporation, 639 F.Supp. 564.

Jack Rowe began selling Sanyo Corporation consumer electronics products as a sales representative in 1971. In 1974, he created the wholly owned Associates to carry out this activity. Rowe contends that it was "understood" between Rowe and Howard Ladd of Sanyo that Sanyo would not terminate Associates except for poor performance uncorrected after notice, and that their relationship would be a long-term "family" relationship similar to comparable arrangements in Japan.

In 1976, Ladd became president of Fisher, owned by the same Japanese interests that owned Sanyo. Ladd retained Associates as a sales representative for Fisher products. Rowe contends that he and Ladd again understood that the same relationship would continue and specifically agreed that termination could only be for poor performance. Ladd emphasized develop-ment of the long-term market and encouraged Rowe to spend seed money for that purpose. Rowe claims that Associates spent $100,000 that would not have been spent but for the long-term relationship. In 1976, however, Associates and Fisher executed a written agreement that contained a termination provision authorizing termination by either party on 30 days notice.

In 1978, Ladd and Rowe orally agreed that Rowe would distribute Fisher products to Mexico on the same long-term basis as the agreement Fisher had with Associates. Rowe then formed International to handle Mexican distribution. Rowe alleges that International spent more than $700,000 for distribution assets in reliance upon a long-term relationship. Rowe also states in his affidavit that the understanding of a long-term, "family" relationship between Associates and International on the one hand, and Fisher on the other, was reinforced in conversations with other named officers of Fisher.

Despite this alleged oral agreement, a July 13, 1978 letter sent from Fisher to International to confirm the distribution arrangement stated that it was terminable on 30 days notice by either party. Rowe testified that this letter, sent at his request, was meant only to show his authority to negotiate with prospective customers, and was not meant to be an integrated agreement on the terms of termination.

In December 1978, Japanese management decided that sales representatives could no longer represent both Sanyo and Fisher. Rowe chose to represent Sanyo. However, Fisher allowed Rowe to continue to represent Fisher in the border areas from El Paso, Texas to Nogales, Arizona. International continued to distribute Fisher products in Mexico. Rowe alleges that Ladd again reaffirmed the long-term nature of the distribution arrangement.

This post–1978 representation by Associates was the subject of a written agreement dated February 1, 1979. This agreement also contained a provision allowing termination by either party on 30 days notice. Gary Kohlman, national sales manag-

er for Sanyo in 1979 and 1980 and an employee in the consumer electronic business for twenty years, stated in his affidavit that from 1970 to 1982, there was an understanding in the consumer electronics industry that if one were retained as a sales representative or distributor by a company having Japanese management, after the first year the representative would be terminated only for poor job performance (or if all sales representatives were terminated, as a result of a shift to the direct sales method of product distribution).

By 1981 International was the largest Fisher distributor in the world. In 1981, Fisher advised Rowe of the possibility of a coming currency devaluation in Mexico. Fisher took precautionary measures, including the withdrawal of credit from all dealers located on the border and the reduction of the level of credit available to International. International nonetheless proceeded with business as usual, apparently assuming the risk of a peso devaluation.

Despite warnings of an impending devaluation, Associates and International continued to extend credit to customers located on the border and in Mexico even though at least one of International's border dealers, Importaciones de Bermejo, was already in default for $283,000 of merchandise. International extended more credit than ever before, and offered credit to dealers from whom Fisher had withdrawn credit in anticipation of the impending devaluation. Meanwhile, International built up its inventory to include $1 million in portable radios, many of which lacked UL certification and thus could not be sold in some states in the United States (*e.g.*, California and Oregon). Additionally, Rowe urged Fisher and United Bank to increase his lines of credit.

In February 1982, Mexico began to devalue the peso. Massive devaluation made Fisher products expensive in Mexico and hard to sell. Rowe states that he brought his concerns to Mr. Natsume, the person in charge of further distribution, and that Natsume assured him that Fisher would stand behind him 100 percent to cover his future losses by discounting future purchases; he states that Natsume, while predicting a recovery in the near future, urged Rowe to take a long-term view and to consider Fisher's long-term interests with customers who owed money to International.

By August 1982, the fall of the peso exposed International to devastating losses unless merchandise could be returned to Fisher or reduced in price retroactively. Rowe testified in deposition that Ladd and Natsume persuaded him not to press his claim for return of the merchandise. Rowe claims that Ladd and Natsume advised him that if he forgot about his claims and acted in Fisher's best interests with the inventory and the customers, all of his losses would be made up through future profits on distribution and commissions on sales. Ladd and Natsume would not, however, permit Rowe to sell his inventory outside his territory unless Fisher approved each transaction.

Because of his long relationship with Fisher and Mr. Ladd, Rowe says he relied on their advice and abandoned his claims. Rowe claims that he acted in Fisher's best interests by extending additional credit to border dealers, thus resulting in further losses; he says that he eschewed aggressive collections which he would have pursued if not for his understanding with Ladd and Natsume. Rowe does not, however, testify that Ladd or Natsume asked him explicitly to extend additional credit or to forego aggressive collections.

Rowe found few buyers outside his territory whose transactions Fisher would approve. Rowe sold most of his inventory in Mexico and at the border at a significant loss. Associates' and International's business faltered. Given its large inventory of unmarketable merchandise, International's new purchases of Fisher merchandise slowed in 1982. Beginning with Fisher's elimination of dealer credit in 1981, Associates' sales also dwindled to negligible amounts. Finally, as a result of the sequence of events in 1982, International's purchases of Fisher merchandise stopped.

On December 29, 1982, Fisher cited the termination clause of the contract and gave Associates 30 days notice of termination.

The letter made no reference to International.

In the first quarter of 1983, International stopped purchasing Fisher merchandise and ceased to do business. On April 26, 1983, Rowe sent a letter to Fisher stating that International had found it necessary to cease doing business, citing his divorce action[1] and United Bank's withdrawal of credit. Rowe now says that this letter was not intended as a notice of termination, but as an emotional appeal to Fisher to put the distribution back on track. Fisher treated this letter as a notice of self termination by International. The trial court agreed.

Rowe's complaint alleged three causes of action. The first cause claimed that International and Associates modified their contracts with Fisher. Rowe claimed that Fisher promised him, at a meeting with Fisher officers, that he could make up his losses through future profits if he agreed not to press his effort to return the merchandise, not to pursue aggressive collections tactics, not to sell his inventory in the United States, and to make additional extensions of credit to Fisher dealers in Mexico.

Rowe's second count was based on the theory that even if the agreement had not been modified by actual agreement, Fisher terminated Associates because Fisher had been bribed to do so by the company that succeeded to Associates territory, Rowe urges that this bad faith termination of an at-will contract violates California's covenant of good faith and fair dealing.

Rowe's third count argues that the oral representations by Fisher employees at the beginning of the relationships between Associates and International with Fisher amounted to an agreement that termination would only be for poor performance uncorrected after notice. Rowe argues that the continued oral assurances that the relationships were on a long-term family basis are evidence that the written contract provisions allowing termination by either party on 30 days notice were intended to allow termination only for cause.

The district court rejected all three of these claims and granted summary judgment against Rowe.

We first consider the third count and the trial court's parol evidence ruling. The court held that evidence of an oral agreement that termination would only be for poor performance uncorrected after notice could not be received to vary the terms of the written contract. Rowe argues that barring parol evidence of his agreement is in conflict with this court's holding in *Sherman v. Mutual Benefit Life Ins. Co.*, 633 F.2d 782 (9th Cir.1980). In *Sherman*, we were presented with a contract which contained the following termination clause: "This Agreement may be terminated at any time by either party, by giving the other sixty days' notice to that effect ..." *Id.* at 783. Sherman alleged that before he signed the agreement, a Mutual official, who was to become his immediate supervisor, assured him that the clause meant that he could be terminated only for good cause. Further, Sherman alleged that he gave up a profitable business to become Mutual's general agent and that a life insurance general agency only becomes profitable after a substantial investment of time and capital. *Id.* at 783–84. The court applied California law and found *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968), to be controlling. In that case, Chief Justice Traynor set out the relevant test for the admissibility of extrinsic evidence to explain the meaning of a written instrument:

> The test ... is not whether [the written instrument] appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Id.* at 37, 69 Cal.Rptr. at 564, 442 P.2d at 644; *Sherman*, 633 F.2d at 784.

---

1. *Rowe v. Rowe* was filed in September, 1982. Mrs. Rowe's primary contention was that Associates and International were community property. By going out of business, Rowe dramatically reduced the value of this potential community asset.

In *Sherman*, the language "may be terminated at any time" was silent on the good cause requirement. *Sherman*, 633 F.2d at 784. Following *Pacific Gas & Elec.*, *Sherman* thus set out to determine whether the phrase reasonably could be interpreted as including a good cause requirement. *Id.* In *Pacific Gas & Elec.*, the court advised that a court must consider the " 'circumstances surrounding the making of the agreement ... including the object, nature and subject matter of the writing ...' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' " *Pacific Gas & Elec.*, 69 Cal.2d at 40, 69 Cal.Rptr. at 565, 442 P.2d at 645 (*quoting Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal.2d 751, 761, 128 P.2d 665, 671–72 (citations omitted) (1942)); *Sherman*, 633 F.2d at 784. The *Sherman* case focused on the nature of the position and the importance of the long-term prospects to Sherman to hold that the clause was reasonably susceptible to an interpretation requiring good cause for termination. *Sherman*, 633 F.2d at 784–85.

█ The language in the clauses at bar is similar to that considered in the *Sherman* case. The written agreement with Associates states that the "Agreement ... shall continue until terminated by either party by thirty (30) days' written notice...." The letter which the trial court found evidenced the prior oral agreement with International[2] stated that "[t]he present appointment is subject to cancellation by either party within thirty, i.e. 30 days, of written notice...." Furthermore, as in the *Sherman* case, Rowe testified and alleged that he invested large sums of money in developing the market for Fisher products in the border areas and Mexico, relying on the long-term relationship. The only differences between this case and the *Sherman* case are that the *Sherman* contract contained the language "may be terminated" and that Fisher did not expressly represent at the time the agreement was signed that the termination clause meant that Rowe could be terminated only for cause. Rowe, however, has provided other evidence that these assurances were made earlier in his relationship with Fisher, that it was understood all along that the relationship was for the long-term and that he would be treated as part of the family, and further, that it was the custom and practice of the Japanese consumer electronics industry to treat its sales representatives and distributors as part of the company "family" according to the Japanese model.

Neither the trial court nor Fisher addressed *Sherman*. The trial court cited *Kolling v. Dow Jones & Co.*, 137 Cal.App. 3d 709, 718, 187 Cal.Rptr. 797, 803 (1982), for the proposition that in a distributorship agreement, when termination for good cause is not a term in the agreement, the agreement is presumed to be terminable at will by either party. Rowe, however, is arguing that the language of the agreement is reasonably susceptible to the interpretation that it requires good cause given the oral assurances and circumstance surrounding the making of the agreement. Fisher's brief similarly mischaracterizes Rowe's argument as asserting that the oral evidence contradicts an express at-will written agreement, and that an oral modification was made. The words "at will" are not expressed in the agreement at all; rather, Rowe argues that the words "shall continue" and "subject to cancellation," when coupled with the surrounding circumstances and oral assurances, can be interpreted as allowing termination only for poor performance uncorrected after notice. Nor is Rowe asserting an oral modification of the written agreement, but that the original agreement was for termination only for poor performance uncorrected after notice.

Rowe testified several times in depositions about his understanding of the grounds for which Associates and International could be terminated. Fisher points out that in one instance Rowe testified that he had not considered under what circumstances Associates could be terminated by Fisher. Elsewhere, however, Rowe testi-

---

**2.** Rowe asserts that this was meant only as a letter of authority and not an expression of their oral agreement.

fied that the circumstances under which Associates could be terminated were never discussed, but the management team expressed full cooperation and implied that he was a part of the corporate family for an indefinite period of time. Still elsewhere he testified that he understood he could be terminated only for good cause. And at yet another time he testified that he understood he could be terminated only in the event of a total collapse of the business or for poor sales. His "understandings" have no probative value in themselves, but, if supported by evidence of Fisher's management's promises, they could be consistent with his claim of a "good cause" agreement. Rowe's affidavit states that in 1971, Ladd, then working for Sanyo, negotiated an agreement with him for a long-term relationship which could be terminated only for poor performance uncorrected after notice. In 1976, Ladd, now working for Fisher, asked Rowe to become a sales representative for Fisher under the same arrangement. In 1979, Rowe signed a new contract with Fisher and did not discuss the circumstances of termination because it was a replacement of the existing agreement. The language of the agreements regarding termination was identical.

Fisher points out that Rowe, in his deposition, stated that there was no discussion of "good cause" at the inception of the distributorship relationship between International and Fisher. Rowe testified that the grounds for termination were never discussed; nor was there any agreement or communication from Fisher with respect to the terms under which either party could terminate their agreement.

■ Rowe insists that this testimony is not inconsistent with his affidavit testimony that International became a Fisher distributor under the prior understanding and agreement between Ladd and himself regarding Associates. Rowe argues that there would have been no need to discuss termination if, as he claims, the distribution contract was meant to put International on the same basis as the existing Associates' contract and was incorporated by reference.

Fisher argues that Rowe cannot raise an issue of fact by impeaching his own deposi-

tion testimony and admissions. *See D'Amico v. Board of Medical Examiners*, 11 Cal.3d 1, 20–22, 112 Cal.Rptr. 786, 800–01, 520 P.2d 10, 24–25 (1974). Rowe's deposition testimony, however, was itself subject to conflicting interpretations and inferences. Rowe argues that even if his possibly conflicting answers raise an issue of credibility, that issue should be submitted to the trier of fact. We agree. This is not the sort of evidence that can be swept away in a summary judgment.

Because we must remand for further proceedings on the parol evidence point, we will deal only briefly with other points briefed and argued.

■ The trial court's rulings on the other counts of the complaint were consistent with established law. Neither the affidavits nor the depositions supported Rowe's theory that there was a jury question whether the contract was orally modified at a "crisis" meeting between Rowe and a group of Fisher managers. The court correctly found that the Fisher group made no promises to Rowe and said further that even if some optimistic language about recouping losses from anticipated future business was promissory in nature, no consideration supported any such promises. We need not reach the question whether Rowe agreed to do anything he was not already obligated to do, or otherwise gave consideration. Because there was no promise, consideration is irrelevant.

■ The trial court's ruling that Rowe's second count—alleging a breach of the implied covenant of good faith and fair dealing—was insufficient to present a material question of fact is likewise free from error. Rowe asserted that the entity which succeeded to his distribution territory was able to displace Rowe's company because of a bribe to someone in the Fisher management. This allegation was unsupported by affidavit, documentary evidence or offer of proof. Accordingly, we need not speculate whether California courts would recognize a species of contractual violation of the implied covenant of good faith and fair dealing when a manufacturer changes distributors because a rival distributor offered an economic incentive to a management decision maker.

It is possible that upon remand Rowe will be unable to overcome the Fisher defense that Rowe's failure to deal appropriately with the Mexican currency collapse after warnings that devaluation was impending constituted "poor performance" justifying termination. However, we reluctantly conclude that the trial court applied the California parol evidence rule in a manner that was not consistent with *Sherman,* 633 F.2d 782. Because Rowe, using parol evidence, tenders a material question of fact on the existence of an unwritten good cause agreement, summary judgment was premature.

The trial court did not specifically decide whether Rowe's letter referring to the economic consequences of his divorce constituted self-termination of his relationship between International and Fisher, removing that issue from the case. On remand the parties should address whether the letter from Rowe to Fisher on the International contract effectively waived any claim that Fisher owed International a duty to spell out a reason for discontinuing that company's distributor relationship.

VACATED and REMANDED, neither party to recover costs in this court.