[L. A. No. 11554. In Bank.—March 28, 1932.]

IRA GOSNELL et al., as Guardians, etc., Appellants, v. RALPH B. LLOYD et al., Respondents.

Clarke & Bowker, James C. Hollingsworth and Sheridan, Orr, Drapeau & Gardner for Appellants.

Lawler & Degnan and Blackstock & Rogers for Respondents.

THE COURT.—This is an appeal by the plaintiffs from a judgment in an action to rescind a contract or for declaratory relief, wherein the right to rescind was denied and the rights of the parties declared.

The plaintiffs are the son and daughter of T. B. Gosnell and sue in their capacity as the legally appointed guardians of his estate. On June 17, 1925, T. B. Gosnell was the co-owner with his son and daughter of a one-eighth share of the royalties payable under an oil lease executed in October, 1913, by Caroline Gosnell and T. B. Gosnell, her husband, and the latter's son and daughter as lessors, to Joseph B. Dabney as lessee. Dabney assigned one-half of his interest as lessee to the defendant Ralph B. Lloyd. Subsequently Caroline Gosnell died and T. B. Gosnell succeeded to her one-third interest in the lessor's rights under the lease.

In June, 1925, Gosnell was about seventy-six years of age. He was a native of Ohio. In 1885 he settled in Ventura County on the land involved herein. In 1914, he married Ethel Gosnell, who was many years his junior. She obtained a divorce from him in 1917 and left Ventura to reside in Los Angeles. In 1921, subsequent to an arrangement by which Ethel Gosnell was to receive all of his property, Gosnell moved to Los Angeles and from thenceforward resided with her.

The defendant Lloyd had lived as a boy in Ventura County and Gosnell and Lloyd knew each other during that period and thereafter. At the time of the negotiations with Gosnell in June, 1925, Lloyd was about forty-eight years old. At an early date Lloyd began prospecting for oil in the neighborhood of the Gosnell property and prior to June, 1925, with others had acquired interests in other lands and leases some of which adjoined the Gosnell property. In June, 1916, Lloyd and his associates sublet their interests, including their interest in the Gosnell lease, and consisting of about twelve properties or units, to the Shell Company with an option to purchase. The Shell Company immediately commenced drilling operations on some of the adjoining leases and on the Gosnell property itself in February, 1917, and subsequently on other units. In the

progress of its drilling operations on all of these properties the Shell Company encountered difficulties, the greatest of which apparently was the water hazard, so much so that in the latter part of 1919, pursuant to the terms of its contract, it surrendered all leases, except those covering three properties which included the Gosnell lease. In 1920 Lloyd leased to the Associated Oil Company certain units surrendered by the Shell Company. Subsequently drilling operations resulted in good producing wells on lands adjoining the Gosnell property.

The Shell Company continued drilling operations on the Gosnell property, completed wells Nos. 1, 2, 3, 4 and 5, and was engaged in the early part of 1925 in bringing to production wells Nos. 6, 7, 8 and 9. Well No. 7 was put on production in January, 1925, at a depth of 4,821 feet, but produced water in excess of oil. In May, 1925, it was "killed" and work on it was suspended until September of the same year. Well No. 8 was completed in February, 1925, at 5,082 feet and flowed salt water. It was also "killed" in May, 1925, and was abandoned the following January. In March, 1925, well No. 9, at a depth of about 4,000 feet, flowed salt water. It was completed on May 5, 1925, at 4,450 feet, with an initial flow of 662 barrels of oil per day. In March, 1925, a test of well No. 6 showed salt water entering below 4,280 feet, and again in April at a depth of 4,313 feet. It was completed about June 10, 1925, with an initial production of 365 barrels at a depth of 4,800 feet. Prior thereto, on land adjoining, and about 150 feet north of the Gosnell property, Notten No. 6, on April 25, 1925, had come in with an initial production of 4,330 barrels at a depth of 4,584 feet. At a like distance from the easterly line of the Gosnell property Lloyd No. 5, prior to April, 1925, had come in with a production of 1900 barrels at 4,050 feet and on April 16th, with an initial production of 3,200 barrels at a depth of 4,695 feet. Lloyd No. 5 was opposite and about 300 feet distant from Gosnell No. 5, which had developed water to an extent ranging from 32 per cent to 84 per cent, and in May, 1925, it had ceased to flow and was "on the pump."

In April, 1922, the Shell Company had exercised its option to purchase the Gosnell lease, and it appears that $82,305 was received by Lloyd as the purchase price of his one-

eighth interest in the lease. Prior thereto Lloyd had received all of the royalties paid by the Shell Company under these leases and he in turn computed the share of each person interested and remitted the amount due to each less the recipient's share of the taxes, which in turn was remitted by Lloyd to the Shell Company to reimburse it for the taxes which it was required to pay under the terms of each lease for the lessors' account. Subsequent to the sale of the leases to the Shell Company, at his own solicitation made to the Shell Company, Lloyd continued to receive and disburse the royalties as formerly. During this time he maintained an office where he also received Shell Company's daily reports of conditions and production on all of its properties in the Ventura field.

It is in evidence that T. B. Gosnell often visited the field to watch drilling operations, especially when a new well was expected to come into production. At frequent intervals, either alone or accompanied by Mrs. Ethel Gosnell, T. B. Gosnell called at Lloyd's office and was permitted to examine the Shell Company's reports there for the reason given by him that he had had a dispute with one of the Shell Company's officials. At these times he jotted figures in a notebook for purposes of comparison with previous figures, and he discussed with Lloyd, or in his absence, with someone else in the office, the progress of the field and other topics. It is in evidence that he complained often of the low production of oil on the Gosnell property as compared with other properties and expressed surprise that the Shell Company could not get a well on his property like Lloyd No. 5, and opined that the wells were going to salt water and that salt water was going to ruin them. He also complained that the royalty checks were not larger.

In 1923 the monthly royalty payment to Gosnell reached its highest mark, approximately $3,100. The highest monthly royalty in 1924 was $1,035.79, and the lowest in that year was $631.82, in December. In January, 1925, Gosnell's royalty was $463.41; in February, $257.22; in March, $241.35 and in April, $268.75. It was also in evidence that in his home Gosnell read the oil news and discussed it with others, and that prior to June, 1925, he expressed a desire to sell out and that on at least one occasion he had suggested to Lloyd that the latter buy his

interest for $150,000, which Lloyd refused. On June 2, 1925, Gosnell, accompanied by Mrs. Ethel Gosnell, went to Lloyd's office and at that time negotiations for the sale of Gosnell's interest to Lloyd were opened. The evidence from this point becomes sharply conflicting, but there is testimony which the trial court might reasonably credit that during this visit, after Gosnell had examined reports and compared figures, he proposed to Lloyd that the latter buy his rights for $100,000; that Lloyd refused this offer, but countered an offer of $72,000, payable $1,000 a month; that Gosnell objected that he must have some money immediately, $15,000 or $20,000; that Lloyd consented to make a cash payment of $15,000 and the balance at the rate of $1,000 a month. There is evidence that Mrs. Ethel Gosnell urged Gosnell to accept the offer, but that the latter stated he would think it over and let Lloyd know within ten days; that subsequently Gosnell telephoned to Lloyd that he would accept the offer. It is in evidence that Mrs. Gosnell sent C. H. Hartke, an attorney, to Lloyd for information respecting the agreement and that Lloyd and Hartke arranged that the former should draw the contract; that later Hartke took the agreement prepared by Lloyd to the Gosnell's home and went over it with them; that on June 15th Lloyd called on Hartke and executed it. On June 17, 1925, Gosnell, Hartke, and Mrs. Gosnell met Lloyd at the Pacific Southwest Trust and Savings Bank in Los Angeles. Together they went to the collection department and conferred with Mr. Hawkins, an escrow officer of the bank. Lloyd introduced Mrs. Gosnell to Mr. Hawkins; also Mr. Hartke as T. B. Gosnell's attorney. Mr. Hawkins read over the contract and called attention to the fact that it did not provide for interest. Lloyd stated that the agreement did not contemplate interest, but Gosnell insisted that he must have interest on the deferred payments, to which Lloyd finally agreed and at Hartke's suggestion a provision therefor was interlined and initialed by the parties. A discussion arose concerning payment of the cost of the certificate of title. Gosnell insisted that he would not pay it, but he finally agreed to pay $25 on account of the cost, the balance to be paid by Lloyd. An understanding was also reached respecting taxes then due, which it was agreed should be deducted from Gosnell's share of the May royalties. The

question was raised as to whether royalties should be accounted for to Gosnell as of June 1st or June 17th, the date of the contract. There is a sharp conflict as to whether Lloyd stated the approximate amount of the May royalties, a check for which had been deposited by him on the day previous, but there is the testimony of Mr. Hawkins and Lloyd that the latter presented a statement of the amount, and it is undisputed that, after June 1st was agreed upon as the appropriate date for the accounting, Gosnell insisted that the oil in the tanks should be checked before the amount of the royalties was accepted as correct. Gosnell executed the agreement and acknowledged it before a notary, whereupon the agreement, the deed and other necessary papers and Lloyd's check for $1,000 for which a receipt was given, were deposited in the escrow. The contract provided that the balance of the $15,000 cash payment should be deposited when the certificate of title was furnished. Under the terms of the contract the deed and certificate of title were to be delivered to Lloyd when the full purchase price had been paid into escrow. Upon inquiry by the escrow officer, Gosnell gave instructions as to the account to be credited with the payments of principal and for monthly notices to himself and Lloyd. It seems not to be disputed that during all of this conference, which lasted about an hour, Gosnell was at no time seated nor apart from the others, but carried on conversations with Hartke and Lloyd and took part in the discussions with the escrow officer.

About June 20, 1925, Lloyd mailed to Gosnell a check for $1355.88, representing Gosnell's share of the May royalties, less the agreed deduction for taxes. It is not disputed that this increase was due to the coming in of well No. 9 in May. The June royalty received by Lloyd, by virtue of well No. 6 coming into production on June 10th, together with the continued production from well No. 9, amounted to $1953.98. In subsequent months the royalties under the Gosnell lease gradually increased by reason of the continued production from wells 6 and 9 and the completion of other wells at depths varying from 5,300 to 6,488 feet, until it reached a peak of about $38,000 in August, 1926, when production then commenced a continu-

ous fluctuation downward until we find that in November, 1927, the royalties to Lloyd amounted to $10,003.

On June 25, 1925, after the receipt of the May, 1925, royalty check, Mrs. Ethel Gosnell stated to Lloyd over the telephone that they were anxious to get the money and requested that the initial payment be made immediately inasmuch as the title company had by letter approved the title, though the certificate had not been deposited. To this Lloyd consented and on June 27th deposited $14,000 and the payment of $1,000 due July 1st, which were immediately withdrawn by the Gosnells. Lloyd continued to make the payments of $1,000 per month, which were regularly withdrawn by the Gosnells. In September, 1926, Gosnell, with Mrs. Gosnell, called upon Lloyd and stated that they desired an advance of $18,000, that Lloyd had been doing well and that they needed that amount of ready money. Lloyd paid this amount into escrow and it was withdrawn by the Gosnells. Thereafter Lloyd continued to make the deposits of $1,000 per month up to and including the deposit made on February 1, 1927. Including that payment, $51,000 had been paid by Lloyd.

On February 9, 1927, Mrs. Ethel Gosnell and the plaintiffs, Ira Gosnell and Lena Bowyer, entered into an agreement among themselves for the recovery of the interest of T. B. Gosnell in the Gosnell lease. Pursuant to that agreement, and on February 10, 1927, the plaintiffs were appointed the guardians of the estate of T. B. Gosnell, who was declared an incompetent. On the same day a notice of rescission was served on the defendants and on the following day this action was commenced.

By their amended complaint the plaintiffs sought to rescind the contract of June 17, 1925, on the ground of fraud and misrepresentation on the part of Lloyd, inadequacy of consideration, and that the contract was indefinite, lacking in mutuality and unenforceable; also on the ground of the incapacity of T. B. Gosnell to make the contract; and sought further a declaration of the rights of the respective parties. By his answer, in addition to denials and affirmative defenses, Lloyd averred a readiness and willingness to complete performance on his part either in accord with the terms of the contract or otherwise as the court might direct.

One of the issues raised by the pleadings was that a confidential relationship or an agency existed between Gosnell and Lloyd. In addition to the facts herein stated, the trial court found that no such relationship existed between the parties to the contract, but that Lloyd in disbursing royalties, etc., was acting as the agent of the Shell Company and not otherwise. The court also found that there existed no fraud, misrepresentation or concealment on the part of Lloyd, but that Gosnell acted with full knowledge, voluntarily and with advice and services of counsel; that the consideration for the contract was fair and adequate, and that the contract was not indefinite nor lacking in mutuality; that at all times involved Gosnell possessed sufficient mentality to manage his property and to understand the nature, extent and value thereof and the nature, purpose and effect of any agreement with respect thereto and that Gosnell was not a person of unsound mind nor likely to be deceived or imposed upon by artful or designing persons; and that T. B. Gosnell and Ethel Gosnell ratified and confirmed the sales agreement and all steps taken thereunder. The court also found that Lloyd had performed all of the conditions on his part to be performed and had made lawful tender of all sums remaining unpaid under the terms of the contract. The decree denied rescission and established the validity of the contract and provided that the defendants, upon deposit of the balance of $21,000 due upon the principal, together with such interest as may be payable under the terms of the contract, should be entitled to receive the deed and other instruments deposited in escrow.

On this appeal the plaintiffs contend first that the contract lacks mutuality and is therefore invalid as a matter of law. The contract recites that in consideration of $1,000 and "for and in consideration of the payments hereinafter to be made" by Lloyd "according to the terms of the agreement", Gosnell "agrees to sell to" Lloyd, the rights described "for the sum of Seventy-two Thousand Dollars ($72,000.00) payable as follows: One Thousand Dollars ($1000.00) paid herewith: Fourteen Thousand Dollars ($14,000.00) upon the delivery" into escrow of deed and certificate of title. It also provided for the payment into escrow of the remaining $57,000 in monthly installments of $1,000 each, and that upon the completion of the payment into escrow

of the gross sum of $72,000, the bank was instructed to deliver the deed, etc. The contract contains also the following provision: "In the event that party of the second part shall fail to make the payments as herein provided, and shall continue in the failure to make payment for thirty (30) days after written notice sent to his address by registered mail by said bank, then, in that event the party of the first part shall be entitled to and shall have the right to take down from the escrow said deed and assignment of his interest in said oil lease, and said party of the first part shall retain all moneys theretofore paid under this agreement into the escrow, in liquidation and settlement in full for all claims and damages against the party of the second part, and the party of the second part shall from that date forward lose all his rights under this agreement and the benefits and provisions created by the same." The plaintiffs contend that there is no agreement in the contract on the part of Lloyd to pay the full sum of $72,000, but that he may cease making payments at any time without further liability, and they argue from this that the remedy of specific performance not being available to Gosnell, Lloyd is not entitled to have the promise of Gosnell enforced.

But this is not an action for specific performance, in which alone the question of mutuality of remedy may arise. (Sec. 3386, Civ. Code; 23 Cal. Jur. 445 et seq.) Furthermore if the answer of Lloyd be considered to seek such relief, we have his concurrent offer of performance which must be deemed to supply any lack of mutuality of remedy of specific performance. (Sec. 3388, Civ. Code; *Thurber* v. *Meves,* 119 Cal. 35 [50 Pac. 1063, 51 Pac. 536]; *Sayward* v. *Houghton,* 119 Cal. 545 [51 Pac. 853, 52 Pac. 44]; *Hay* v. *Mason,* 141 Cal. 722, 723 [75 Pac. 300]; *Bird* v. *Potter,* 146 Cal. 286 [79 Pac. 970]; 2 Cal. Jur. 452.)

■ There is no merit in the contention that the respective promises or obligations of the parties are lacking in mutuality—in other words, that the promise of Gosnell is not supported by any promise on the part of Lloyd. Accepting the plaintiffs' construction of the contract as unilateral, we have a simple contract where performance of the act of payment on the part of Lloyd is a consideration in law for performance of the promise of Gosnell to convey. (6 Cal. Jur., p. 213; 1 Williston on Contracts, pp. 314, 315.)

An inquiry into this question in a court of law, therefore, discloses nothing illusory respecting the consideration for the promise of Gosnell to sell—it is supported either by the promise of Lloyd to pay the stipulated purchase price, or by the act of performance on his part. The inquiry into the question of adequacy of consideration must be made, therefore, in a court of equity pursuant to principles applicable in cases of rescission. The question presented for review in connection with this and the further contentions of the plaintiffs is whether the findings of the trial court are supported by the evidence.

There is no evidence in the record that Lloyd bore toward Gosnell any fiduciary or confidential relationship or that the relation of principal and agent existed between them. The plaintiffs assert that Gosnell ''placed great confidence and reliance in'' Lloyd, but that fact, if it existed, could not impose any corresponding duty upon Lloyd in the absence of any act of the parties creating or establishing a confidential relationship. (*Bacon* v. *Soule*, 19 Cal. App. 428 [126 Pac. 384].) While the evidence on the issues of misrepresentation and fraud by concealment was conflicting, nevertheless the record sufficiently supports the trial court's findings that Gosnell was informed of the coming in of wells in the months of May and June and of the amount of the May royalties; that he had independent knowledge of all material facts bearing upon the transaction, and that he acted voluntarily and independently, with the services and advice of attorney Hartke. With reference to knowledge of facts subsequent to the execution of the contract, there is the testimony of Ethel Gosnell that she had heard of a well coming in with the largest production of any well previously brought in on the Gosnell lease and that both she and T. B. Gosnell had read of it in the papers in addition to being advised of it by Mr. Lloyd in a letter written to Mr. Gosnell on September 2, 1925, and that they had had conversations concerning the increased production. Ethel Gosnell testified that both she and T. B. Gosnell had knowledge that there were wells ''coming in right along''.

The factors bearing on the question of the adequacy of the purchase price to be paid by Lloyd must be viewed as they existed at the time the parties negotiated. The trial court might well conclude from the evidence that up to and

at that time no one believed or could have believed that the oil sands on adjoining property were any other than water sands on the Gosnell property, and that that situation was given due weight by Gosnell at the time the contract was made, and in fact was the power which motivated Gosnell's approach to Lloyd and his offer to sell him his interest. Considering the past production from the Gosnell lease, the obstacles to be overcome before any great increase in that production became apparent for the future, the fact that $82,000 was received by Lloyd for three times Gosnell's interest, and that there was evidence that $75,000 for Gosnell's interest, computed as of the time when the parties were negotiating, was a fair price, we must conclude that the trial court was justified in finding that the consideration was fair and adequate. Equity will not estimate the fairness and adequacy of the purchase price with relation to events which transpire subsequent to the time when the parties contracted. (*Colton* v. *Stanford*, 82 Cal. 351 [16 Am. St. Rep. 137, 23 Pac. 16]; *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587 [23 L. Ed. 328].) Furthermore, it fairly appears from the record that Gosnell believed the receipt of $1,000 a month, compared with the amounts which he had been receiving, irrespective of the future production, to be a good bargain. ■ In an action for rescission, where both parties were in a situation to form an independent judgment and acted knowingly and intentionally, mere inadequacy, unaccompanied by other inequitable incidents, is never of itself a sufficient ground for canceling an executed or executory contract, and courts of equity will not interfere with the value which the parties in such a situation have themselves placed upon the subject matter. (2 Pomeroy's Equity Jurisprudence, sec. 926.)

■ Viewing the questions of incapacity and unsoundness of mind of Gosnell most favorably to the plaintiffs' contentions, we are unable to discover sufficient evidence in the record upon which a finding that Gosnell was incompetent at the times involved, either to manage his own affairs or to understand the nature or effect of the contract, could be based. Gosnell was afflicted from birth with a cleft palate which made conversation with him difficult. He did not write except to sign his name. There is evidence that at the age of seventy-six he was suffering from some of the

effects of senile dementia; that at times he was not very strong and had to be helped into an automobile and when climbing stairs; that on several occasions he had had involuntary movements of his bowels; that sometimes he had difficulty in walking and used a cane and at times complained of dizziness; that sometimes he repeated conversations and that his memory was not so good; and that he had lost weight and appeared feeble in comparison to the large striking physique of his former years. It was in evidence that while in Ventura Gosnell lived in unsanitary conditions; that he ate unwholesome food; that he had boils or sores on his body; that he hoarded junk and was miserly and complained of the banking system and the exaction of interest; that at times he was fanatical on the subject of herbal and religious cures for physical ailments; that he became angry apparently without provocation, and had an exalted opinion of himself. As further evidence of incompetency the plaintiffs offer evidence of some alleged improvident expenditures and investments; also the claimed unbusinesslike transactions wherein Gosnell deeded and assigned all of his property and his interest in the Gosnell lease and the contract with Lloyd to Ethel Gosnell; the gift to her of $10,000 cash out of the $15,000 initial payment, and the expenditure of the balance for a Marmon car for Ethel Gosnell and a service station for her son, and the receipt by Ethel Gosnell of the $18,000 advance for some investment of her own. On the other hand there is evidence that for years immediately preceding the transaction involved herein Gosnell had invested and taken care of considerable property without assistance. It has frequently been held as matter of law that infirmities of the type herein listed are insufficient evidence of unsoundness of mind or incapacity to understand the nature or effect of a contract. (See *Rollins* v. *Smith*, 72 Cal. App. 773 [238 Pac. 771], and cases therein cited.) Here the evidence does not compel the conclusion that any of the infirmities or peculiarities of Gosnell affected his conduct or understanding during the negotiations for and execution of the contract, nor the subsequent dealings with Lloyd. It is not disputed even by the witnesses for the plaintiffs, including Ethel Gosnell, that T. B. Gosnell conducted himself with understanding and took an active part in the negotiations

for the contract and in the transaction by which they were consummated. Considering all of the elements contended by the plaintiffs to have a bearing on the alleged inequity of upholding the contract involved here, i. e., the price agreed upon, the mental and physical state of Gosnell, and the conduct of Lloyd, certainly it cannot be said that this case, applying the principles discussed in cases such as *Pomeroy* v. *Collins,* 198 Cal. 46, 68, 69 [243 Pac. 657], *Odel* v. *Cox,* 151 Cal. 70 [90 Pac. 194], and *Allore* v. *Jewell,* 94 U. S. 506 [24 L. Ed. 260], should be governed by the results reached in those and similar cases relied upon by the plaintiffs.

A further and important phase of this case is that immediately following the execution of the contract of June 17, 1925, Gosnell assigned all of his interest therein to Ethel Gosnell. Thereafter Ethel Gosnell and T. B. Gosnell, with full knowledge of the increase in production and of all matters sufficient to put them on notice, consented to further performance by Lloyd and received all of the sums paid by Lloyd, including the $18,000 advanced in September, 1926, and delayed bringing their action for nearly two years after such knowledge. At no time during this period did Ethel Gosnell indicate by word or deed that she considered Gosnell incompetent at the time the contract was executed, nor did she or Gosnell complain of any other matter touching the issues herein. The interest of Ethel Gosnell in the contract involved was not lost by virtue of the assignment made by her to the plaintiffs prior to the commencement of this action. Concurrently with the execution of that assignment, a reassignment was executed by the plaintiffs to Ethel Gosnell and deposited in escrow for her benefit. That conduct and delay of the parties entitled to rescind after a discovery of the existence of the right may constitute a waiver of the right of rescission is well settled (*Ruhl* v. *Mott,* 120 Cal. 668 [53 Pac. 304]), and the trial court under the facts presented was justified in finding that the right, if any existed, was so waived by Ethel Gosnell and T. B. Gosnell.

The trial court also might properly consider Ethel Gosnell's interest in the outcome of the present action by virtue of the agreement of February 9, 1927, whereby she was to receive twenty per cent of the estate recovered. This in-

258

terest was a factor in determining the weight to be given to her testimony.

■ But one other point raised by the plaintiffs requires notice. It is claimed that the contract is uncertain and indefinite, and therefore unenforceable, because it is not clear whether it provides for the interest as well as the principal to be paid into the escrow before the defendant Lloyd becomes entitled to the deed. But if in this respect there exists any uncertainty, it is a question of construction which has been determined favorably to the plaintiffs and of which they therefore may not complain.

Finally, it may be said that this case is one peculiarly for the trial court in judging the credibility of the witnesses and resolving the conflicts in the evidence. In view of the findings no question of law presented would justify a reversal.

The judgment is therefore affirmed.

Rehearing denied.