**C. PAPPAS CO., INC., Plaintiff,**

v.

**E. & J. GALLO WINERY and McKesson Wine & Spirits Co., Defendants.**

**No. CV F 83–296–EDP.**

United States District Court, E.D. California.

May 22, 1985.

Dean A. Bailey, Stammer, McKinght, Barnum & Bailey, Fresno, Cal., D. Peter Harvey, Horning, Janin & Harvey, San Francisco, Cal., and Robert D. Paul, Richard A. Oetheimer, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

Oliver W. Wanger, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., Elliot S. Kaplan, John N. Love, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., and Wellesley, Mass., for defendant Gallo.

Nickolas J. Dibiaso, Steven M. McClean, David M. Gilmore, Thoms, Snell, Jamison, Russell & Asperger, Fresno, Cal., for defendant McKesson.

## MEMORANDUM DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

PRICE, District Judge.

The defendants E. & J. Gallo Winery (hereinafter "Gallo") and McKesson Wine & Spirits Co. (hereinafter "McKesson") have filed a comprehensive motion for summary judgment.

### FACTUAL BACKGROUND

Plaintiff C. Pappas Co., Inc. (hereinafter "Pappas") is a Massachusetts corporation engaged in the wholesale distribution of beer, wine and spirits. Since 1967 they have served as distributor of certain Gallo products in the State of Massachusetts,

principally in the Boston area. All during that period of time the distributorship was operated by Pappas pursuant to a series of written contracts. The contract which is in issue in the instant case was entered into on December 1, 1976. It provided in pertinent part, insofar as these motions are concerned, the following covenants:

1. It was agreed that Pappas was to be a nonexclusive distributor.

2. Pappas was to use its best efforts to develop the full potential for, and diligently sell, distribute and promote such products (the specific Gallo products specified in the contract) in all licensed retail premises in the State of Massachusetts.

3. Nothing in the agreement limited or intended to limit the area in which Pappas could sell said products.

4. Nothing in the agreement was intended to give Pappas any exclusive rights within any part of any area described above.

5. The agreement was personal in nature, was not assignable, and could be terminated as to all or any products by either party giving thirty (30) days advance written notice to the other party.

6. The agreement was entered into under the laws of the State of California and was to be construed thereunder, and any cause of action arising between the parties, whether under this agreement or otherwise, was to be brought only in a court having jurisdiction and venue at the home office of the Winery.

All of the parties concede that the home office of Gallo is situate in Modesto, Stanislaus County, and in the Eastern District of California.

For several years preceding this action, the Court finds that Pappas was the only Gallo distributor in the Boston, Massachusetts area. Further, several years prior to the events leading to this litigation, other Gallo distributors operating in Massachusetts began incursions into the Boston area. The evidence is undisputed that the matter was discussed between the principals of Gallo and the principals of Pappas at that time, and it was explained to Pappas that Gallo could not prevent such incursions. Indeed, the evidence clearly demonstrates that the principals of Pappas understood at all times that they did not have an exclusive distributorship for any area in Massachusetts.

At some point after signing the 1976 Agreement, Pappas began to experience financial trouble. In order to solve their problems, Pappas sought to sell all or a portion of their business or its assets to other distributors. They negotiated with both McKesson and a company not a party to these proceedings known as Whitehall Company, Ltd. (hereinafter "Whitehall"). There is no evidence that Pappas sought any counsel from Gallo as to the acceptability of either prospective purchaser during the negotiations.

The negotiations with Whitehall culminated in the parties signing a letter of intent wherein Whitehall would purchase all or substantially all of Pappas' physical assets. Although neither party was unconditionally bound by the letter of intent, Whitehall took care to specify that their obligation under the letter of intent was expressly "conditioned and contingent upon our appointment by Gallo Wineries and its subsidiaries as a co-distributor of their products in Eastern Massachusetts." Apparently Whitehall did not, at this juncture, reveal to Pappas that in 1977 they had sought a distributorship from Gallo, which request was rebuffed.

Arrangements were made for Whitehall to visit with the Gallo principals in Modesto in January of 1982. In preparation for this meeting, Gallo had instructed a Gallo employee to make a survey of Whitehall's performance in the areas in which they operated in Massachusetts. On February 3, 1982, K.C. Bertsch, Gallo's Vice President-Director of Sales, wrote Whitehall indicating that Gallo would not appoint Whitehall as a distributor of Gallo products. The concluding sentence of the Bertsch letter is quite pointed: "If Whitehall were to attempt to assume all or part of the distribution responsibilities of C.

Pappas Company with regard to the Winery's products, the Winery would exercise its contractual rights to terminate the Pappas distributorship and would not appoint Whitehall as a Winery distributor." A copy of this letter was simultaneously forwarded to Pappas with a letter addressed solely to Pappas expressing Gallo's displeasure at certain anticipated changes in their operation contemplated by Pappas. On June 16, 1982, Gallo entered into an agreement of distributorship with McKesson. The contract document entered into with McKesson is identical in text.[1]

This litigation followed, being filed first in the United States District Court in Massachusetts. The matter was removed to this district on motion by Gallo. 565 F.Supp. 1015. After removal to this Court, McKesson's motion to intervene as a defendant was granted on June 30, 1984.

After discovery was undertaken by the parties in this action, Gallo came into possession of certain knowledge with reference to the contract entered into between Pappas and Whitehall which caused them to terminate Pappas as a distributor. Apparently the propriety of that termination is still in litigation in Massachusetts. The Court does not consider the termination as being material to any of the issues raised in either Gallo's or McKesson's motions, or in Pappas' response to the same, although the parties have referred to it in their moving and responding papers.

## GALLO'S MOTION FOR SUMMARY JUDGMENT

Pappas' complaint consists of thirteen (13) counts. The Court will discuss each count separately.

### Count I

Count I is a straight breach of contract count.

Reading Pappas' memorandum in opposition to Gallo's motion, it is Pappas' position

that: First, Gallo owed an obligation to Pappas to appoint Whitehall as a distributor in Massachusetts in order to allow the proposed sale by Pappas to Whitehall to be consummated on the terms as originally contemplated;[2] and second, Gallo owed an obligation to Pappas not to appoint a second distributor in the Massachusetts area.

As pointed out above, the contract clearly contains a choice of law clause, and the choice of law is California. Plaintiff concedes that California law is applicable in this case.

■ It has been the law in California for many years that even an exclusive distributorship not for an agreed or specified term is terminable. *See A.B.C. Distrib. Co. v. Distillers Distr. Corp.* (1957) 154 Cal. App.2d 175, 316 P.2d 71; *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery,* 454 F.2d 442 (9th Cir.1972). Clearly then, a manufacturer has the right to insert a competing distributor in an area already occupied by a nonexclusive distributor. The extended reference in Pappas' opposing papers does not in any way change this fundamental rule.

Pappas argues that in this case, the "implied covenant of good faith and fair dealing" somehow overrules the foregoing precedent. None of the landlord-tenant cases cited by Pappas change the California law as applied to distributorship agreements. Indeed, the testimony of the Pappas' executives clearly demonstrates a clear understanding that Pappas' contract was neither exclusive nor assignable.

### Count II

■ Count II of Pappas' complaint alleges that Gallo's actions constitute violations of the obligations of good faith and fair dealing in the performance and enforcement of contracts set forth in Sections 1–

---

**1.** The product "mix" of the two contracts may be different. The Court did not make a detailed comparison because that fact is not essential to the Court's decision in this matter.

**2.** Pappas cites neither fact nor law to buttress this remarkable proposition.

203 and 2–103(1)(b) of the Uniform Commercial Code.[3]

At the outset, it should be noted that California did not adopt the Uniform Commercial Code per se, but adopted its own version of the same. However, the sections referred to in Pappas' First Amended Complaint were adopted by the California legislature. *See* California Commercial Code § 1–203.

In approaching this subject in California, initially a distinction must be made between the above-cited provision of the California Commercial Code, which is an implied covenant in every contract, and the discussion in certain special relationship cases where the breach of such covenant may result in tort liability rather than merely a breach of contract. *See Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979); *Tameny v. Atlantic Richfield Co*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980). Our focus here is only on the aspects of this covenant as it applies to the law of contracts. The limitations of the covenant are well explained in 1 *Witkin Summary of California Law*, 8th Ed., § 576, at p. 493:

> "There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract.... [T]his covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose."

The limitations on the trial court's use of the implied covenant of good faith and fair dealing to rewrite a distributorship contract were extensively discussed in *Walnut Creek Pipe Distributors, Inc. v. Gates*

*Rubber Co.*, 228 Cal.App.2d 810, 815, 39 Cal.Rptr. 767 (1964):

> Respondent points to the unfairness of the situation to justify the finding of an implied covenant of repurchase. The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity. "[I]mplied covenants are not favored in the law; and courts will declare the same to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made." (*Cousins Inv. Co. v. Hastings Clothing Co.*, 45 Cal.App.2d 141 at 143, 113 P.2d 878.)
>
> The rules controlling the exercise of judicial authority to insert implied covenants require several concurrent conditions: (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on grounds of legal necessity; (4) a promise can be implied only where it may be rightfully assumed that it would have been made if attention had been called to it; and (5) there can be no implied covenant where the subject is completely covered by the contract. (*Cousins Inv. Co. v. Hastings Clothing Co., supra*, at p. 149 [113 P.2d at p. 882].)

---

**3.** The only difference between plaintiff's position as to the first and second causes of action appears to be that California's adoption of a modified version of the Uniform Commercial Code brings into play authorities other than those decided on the basis of California precedents.

These conditions are required whether the contract involves real or personal property. (*A.B.C. Distrib. Co. v. Distillers Distrib. Corp.*, 154 Cal.App.2d 175, 185, 316 P.2d 71.)

Where all of these requirements are met, one of the most commonly implied covenants is that of termination or performance within a reasonable time where the parties have failed to specify time (*San Francisco Brewing Corp. v. Bowman*, 52 Cal.2d 607, 343 P.2d 1. *J.C. Millett Co. v. Park & Tilford Distillers Corp.* (D.C.S.D.Cal.1954) 123 F.Supp. 484). One of the most commonly rejected covenants, regardless of hardship, is the implication that a distributorship agreement is exclusive where not so specified....

Accordingly, as to Count II, none of the evidentiary submissions relied upon by Pappas or the legal authorities cited by plaintiff demonstrate there is a triable issue of fact on this count.

## Count III

■ In count Three, Pappas alleges the existence of and a breach by Gallo of the fiduciary duty arising from their business relationship and the community of interest between them. In support of this proposition, Pappas cites two Eighth Circuit cases involving service station operators whose franchise had been terminated by the franchiser oil company.[4] The contention that a fiduciary duty existed between a manufacturer and his authorized dealers was soundly rejected in *Rickel v. Schwinn Bicycle Co.*, 144 Cal.App.3d 648, 192 Cal.Rptr. 732 (1983).[5] The California court noted the existence of the Eighth Circuit cases and drew a distinction between a franchiser/franchisee relationship and manufacturer/distributor relationship. To the same effect *see Worldvision Enterprises, Inc. v.*

*American Broadcasting Co., Inc.*, 142 Cal. App.3d 589, 191 Cal.Rptr. 148 (1983), *hrg. denied.* As pointed out in *Rickel*, the underlying basis of a confidential relationship is the preclusion of any nonmutual profit arising from the dealings of the parties. Clearly, the relationship of manufacturer/distributor cannot ordinarily meet this test.

For all of the foregoing reasons, Gallo's motion as to Count Three must be granted.

## Count IV and Count V

Counts IV and V are based upon the California tort of tortious interference by one party with an existing contractual or prospective contractual rights of another. Gallo's alleged interference with the prospective sale to Whitehall forms the basis for Count IV, and the designation of McKesson as a distributor who then became a competitor of Pappas for Gallo products, forms the basis of Count V.

The parties agree that California law applies, or alternately that Massachusetts and California law are the same on this point.

■ There are five elements to this tort:

1. An economic relationship containing the probability of future economic benefits to the plaintiff;

2. Defendant's knowledge of the existence of the relationship;

3. Defendant's intentional commission of acts designed to disrupt the relationship;

4. Actual disruption; and

5. Damages.

*See Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.*, 116 Cal.App.3d 111, 172 Cal.Rptr. 74 (1981); *Olivette v. Frischling*, 104 Cal. App.3d 831, 837, 164 Cal.Rptr. 87 (1980).

---

**4.** Actually, in one case, the Eighth Circuit upheld a finding of fiduciary duty, but in the second and later case, the Eighth Circuit panel found no fiduciary duty. Both cases turned on an interpretation of state law, *i.e.*, the law of South Dakota in one instance, and the law of Missouri in the other.

**5.** In *Rickel, supra,* plaintiffs made the same complaint as does Pappas, *i.e.*, that Schwinn interfered with the sale of their business, the assets of which included a Schwinn distributorship. Schwinn refused to grant their prospective purchaser a Schwinn distributorship.

As pointed out above, when Whitehall representatives visited Gallo in Modesto in January of 1982, there was no valid enforceable contractual relationship then existing between them. *See* Pappas' Exhibits 11 and 12. Neither is there any evidence in this case that Gallo was aware of the exact arrangement that had been entered into between Pappas and Whitehall, other than that Whitehall was a prospective purchaser. Significantly, Pappas points to no deposition testimony or facts discovered by interrogatories which they contend establishes either elements one or two. On the other hand, Gallo points to the exchange of letters between Pappas and Whitehall.

In answering Whitehall's letter, Pappas wrote, in pertinent part:

> However, due to the nature of this transaction and before any final documents are executed, we respectfully request that you receive prior approval from the E.J. Gallo Winery, such that Whitehall Company, Ltd., or its nominee, will be an acceptable replacement distributor in the marketing areas that C. Pappas Co., Inc. currently serves. Both must act in the best interests of the Gallo Winery, therefore, their blessing must be a precondition of our deal.

From the discussion contained above, it is abundantly clear that there is no triable issue of fact as to whether or not Gallo knew of the arrangement between Whitehall and Pappas, and Pappas, in their opposing papers, points to none.

The California Supreme Court recently addressed this area of the law in *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984). At 767, 206 Cal.Rptr. at 360, 686 P.2d at 1164, the court observed:

Similarly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove *"intentional* acts on the part of the defendant *designed* to disrupt the relationship." (citations omitted)

Only if and when plaintiff establishes "an attempt to interfere" does the issue of "justification" come into play.

A careful reading of the seminal decision of *Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 537 P.2d 865 (1975), clearly demonstrates the level of knowledge that must be possessed by a defendant, as well as the defendant's state of mind that must be proven by the plaintiff before the plaintiff may be entitled to recover on this theory.

■ Since Pappas does not cite any evidentiary material indicating Gallo's prior knowledge or Gallo's intentions are triable issues of fact, Gallo must prevail as to Count IV.[6]

In Count V a different problem is presented. Pappas points to evidence that McKesson has conceded that it solicited Gallo business from some major chain accounts that had formerly purchased some of their Gallo product requirements from Pappas. McKesson further admitted, says Pappas, that McKesson had reason to know at the time of the solicitation that the accounts being solicited were then customers of Pappas. There is further evidence, Pappas contends, that McKesson attempted to lure away the Pappas wine sales manager, one Ken Mitchell, and further that McKesson offered illegal quantity discounts to Pappas' customers on Gallo products.

The Court has previously resolved the issue as to whether Gallo's appointment of McKesson breached their contract with Pappas. The Court has further determined that the refusal to appoint Whitehall did

---

**6.** In *Worldvision, supra,* at 595, 191 Cal.Rptr. at 151, the court put the issue raised by Pappas' third count:

> The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty in the absence of an act creating or establishing

a fiduciary relationship known to law. (*Hayward Union etc. School Dist. v. Madrid* (1965) 234 Cal.App.2d 100, 124, 44 Cal.Rptr. 268. *Gosnell v. Lloyd* (1932) 215 Cal. 244, 254, 10 P.2d 45.) Plaintiff's assertion is insufficient to create a triable issue of fact which would preclude summary judgment.

not raise a triable issue of fact under the fourth count of Pappas' complaint, *i.e.*, interference with a prospective economic advantage.

Clearly, the appointment of McKesson by Gallo was motivated by a legitimate business purpose, *i.e.*, to create stronger intra-brand competition among the persons authorized to distribute Gallo products in the Massachusetts market. In *Charles Chapman Building Co. v. California Mart* (1969) 2 Cal.App.3d 846, 82 Cal.Rptr. 830, the court pointed out that where no breach of contract is shown, the law recognizes a more extensive privilege to interfere with business relations than where a breach appears.[7] Further, if the interference involves no more than recognized trade practices, such as advertising, solicitation or reduction of prices, a competitor's loss as a result of the competition is not actionable. Significantly, Pappas nowhere demonstrates that the McKesson actions complained of were undertaken at the direction of Gallo. Indeed, as *Chapman* points out, citing earlier California authority, competition in business, though carried to the extent of ruining a rival, is not ordinarily actionable provided that the competition does not involve wrongful conduct such as fraud, misrepresentation, intimidation, coercion, obstruction or molestation of the rival or his servants or workmen, or the procurement of the violation of contractual relationships.

Pappas has cited no cases, and the Court has found none, that would indicate that any of the actions complained of by McKesson was wrongful except a quantity discount offer. Since the quantity discount had not been properly published according to Massachusetts law, the practice was terminated immediately by the Alcohol Beverage Control Commission, and as a result of the administrative action, no customer was ever allowed to claim that discount. As a result of withdrawing the discount offer,

McKesson allegedly suffered damage in Massachusetts. This allegation by McKesson is not controverted.

The only manner in which Gallo is tied into these unilateral acts by McKesson is the rather fatuous statement that Gallo knew or should have known that McKesson would strongly compete with Pappas in the business of retail customers buying Gallo products. As pointed out above, this is precisely the condition that Gallo wished to create by the appointment of McKesson in the first instance.

[8] Pappas' entitlement to recover from McKesson in their fifth count requires them to plead and prove precisely the same elements of the tort discussed above. Pappas has failed to demonstrate the existence of the first element, *i.e.*, the existence of a prospective economic advantage between Pappas and any of the retail outlets. Significantly, Pappas cites no authority and points to no evidentiary submission (except that noted above) that shows that McKesson acted other than as a competitor seeking to sell Gallo wine to retail wine accounts, including those previously served by Pappas.

### Count VI

Pappas' Count VI alleges that Gallo and McKesson conspired to cripple competition and destroy Pappas, which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Careful consideration of all of the evidence bearing on this issue reveals the following:

We learn from the affidavit of Rolf Peterson and the depositions of Gallo personnel, that for several years prior to McKesson's appointment, Gallo was concerned with the performance of Pappas in the Boston area, as well as with Pappas' financial stability. We also note from the Gillis dep-

---

**7.** Although not material to our holding, the Court has already noted:

(1) That Whitehall apparently withheld from Pappas their unsuccessful attempt in 1977 to gain a Gallo distributorship in Massachusetts.

(2) After Gallo's refusal, Pappas and Whitehall altered their contractual relationship in an attempt to circumvent the nonassignability clause of the Gallo contract.

osition that Gallo was not always enchanted with McKesson's performance, and that Gallo had previously terminated McKesson distributorships in Florida. The adoption of and compliance with Gallo's merchandising philosophy by the distributor was a condition precedent to being appointed a Gallo distributor in the late 1970's and early 1980's, and to the retention of such distributorship. The search for such distributors in the Boston area was constant.

The Ninth Circuit held in *Seagrams & Sons v. Hawaiian Oke*, 416 F.2d 71, at 81, "Surely a manufacturer and its national or regional distributor, whether a subsidiary or an independent, can agree to transfer their business from one wholesaler to another without running afoul of the group boycott *per se* rule, in the absence of some forbidden anti-competitive or monopolistic objective."

This citation exposes the second flaw in Pappas' position, *i.e.*, where is the "anti-competitive" or "monopolistic" objective? The evidence relied on by Pappas demonstrates the opposite, that is, that Gallo was constantly striving to make its products more competitive in the Boston market.

Pappas argues inferentially that McKesson was a poor choice to accomplish Gallo's objectives. It was never the purpose of Congress, by the passage of the Sherman Act, to empower federal judges to sit in judgment on the wisdom of business judgments, but only their legality! As was stated by the Supreme Court in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984),

> Thus, something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective."

*Edward J. Sweeney & Sons, supra* [637 F.2d 105], at 111 [CA3 1980]; *accord H.L. Moore Drug Exchange v. Eli Lilly & Co*, 662 F.2d 935, 941 (CA 2 1981) *cert. denied,* 459 U.S. 880, 74 L.Ed.2d 144, 103 S.Ct. 176 (1982) *cf. American Tobacco v. United States*, 328 U.S. 781, 810, 90 L.Ed. 1575, 66 S.Ct. 1125 (1946) (Circumstances must reveal "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement").

The motion of Gallo and McKesson for summary judgment as to Count VI is granted.

## Count VII

In Count VII, Pappas alleges that:

1. Gallo agreed, combined and conspired with McKesson to destroy the value of the agreement and Pappas' distribution rights, and to deprive Pappas of the opportunity to sell and assign these rights at fair value; and

2. Gallo and McKesson undertook to carry out what they agreed and conspired to do.

As pointed out in 4 *Witkin, Summary of California Law*, 8th Ed., 2330:

> Occasionally, in actions against joint tortfeasors, the defendants are charged with "conspiracy," and the cause of action is some times described as one for "civil conspiracy." (*See, e.g., Neblett v. Elliott* (1941) 46 C.A. [Cal.App].2d 294, 302, 115 P.2d 872.) Strictly speaking, however, there is *no separate tort* for civil conspiracy, and there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful act* itself is committed and damage results therefrom.
>
> Hence, where the complaint charges a conspiracy and the commission of a wrongful act, the only significance of the conspiracy charge is that each member may be held responsible as a joint tortfeasor, regardless of whether or not he directly participated in the act.

As we have pointed out above, the Pappas' agreement, not being freely as-

signable and not being exclusive, had no value in and of itself. Hence, the allegations of conspiracy add nothing to this count that give it substance.[8]

Significantly, Pappas does not point to any evidentiary facts to support these contentions. The Court has disposed of Pappas' contentions regarding a conspiracy in the antitrust context, *supra*. The same discussion is equally applicable here.

The second portion of Pappas' allegations is apparently directed to a possible joint liability for intentional interference with a prospective economic advantage.

Having disposed of Gallo's liability thereunder, we now turn to McKesson. Just as none of the requisite elements of the tort are satisfied as to Gallo, the same is equally true as applied to McKesson.

Gallo's and McKesson's motion for summary judgment as to Count VII is granted.

### Count VIII

■ In Count VIII Pappas attempts to state a cause of action under Chapter 93A of the Massachusetts General Laws, alleging that Gallo has, in fact, engaged in willful, unfair and deceptive acts and practices, and unfair methods of competition in violation of the Massachusetts General Laws, Chapter 93A, Section 2.

Section 2(a) of that Act declares that unfair methods of competition and unfair deceptive acts or practices in the conduct of any trade or commerce are unlawful.

Section 3(b) of the Act exempts from its operation any trade or commerce of any person of whose gross revenue of at least twenty percent (20%) is derived from transactions in interstate commerce, excepting however, transactions and actions which: "(i) occur primarily and substantially within the commonwealth."

It is the contention of Gallo that they are exempted from the operation of the Act because more than twenty percent of their total commerce flows into interstate commerce. Further Gallo argues, all of the acts of which the plaintiff now complains, *i.e.,* the decision not to appoint Whitehall as a distributor, the appointment of McKesson as a distributor, the execution by Gallo of the McKesson distributorship, and the filling of all of McKesson's orders, occurred at Gallo's home office in Modesto, California. Gallo's position is buttressed by the citation of several authorities that concur in this result.

Pappas, on the other hand, argues that Pappas' damage occurred in Massachusetts, and this is a significant factor in determining whether the actions forming the basis of this claim occurred primarily and substantially in Massachusetts. In support of this position, they cite *Bushkin Assoc., Inc. v. Raytheon Co.* (1985) 393 Mass. 622, 473 N.E.2d 662. The *Bushkin* case is not helpful to Pappas. First of all, on facts similar to the instant case, the Massachusetts Supreme Court had no difficulty in sustaining Raytheon's contention that the acts being relied upon by Bushkin occurred primarily in New York. By dictum, the Massachusetts Supreme Court suggested that in a close case, the approach employed by the Bushkin court could be employed in determining the appropriate choice of law had that issue been certified to them by the First Circuit Court of Appeals, and could be used to determine the situs of the important transactions.

Because Gallo has sustained its burden with regard to its claimed exemption, the Court finds that Gallo is entitled to summary judgment on this count.

### Count IX

■ In Count IX, Pappas alleges violations of Sections 17000, *et seq.,* of the California Business and Professions Code. Specifically, Pappas alleges that the defendants have colluded with each other in violation of the Business and Professions Code, Sections 17046 and 17048.

---

**8.** The Court is aware of the antitrust literature declaring that a "conspiracy" is the cornerstone of Section 1 violations. However, a close reading of the applicable cases demonstrates that the object of such conspiracies must be a prohibited antitrust activity.

Section 17046 provides that it shall be unlawful for any person to use any threat, intimidation or boycott to effectuate any violation of this chapter.

Section 17048 provides that it is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation of this chapter.

Defendants argue that this statute applies only to price discrimination or price-related practices. They appear to be correct in this. Witkin notes that the unfair practices act chiefly prohibits selling articles below cost, or giving them away, for the purposes of injuring competitors and destroying competition.

In *Uneedus v. California Shoppers, Inc.* (1978) 86 Cal.App.3d 932, 150 Cal.Rptr. 596, the court noted that the act closely paralleled the Robinson-Patman Act in that each proscribed three basic types of business practices: Price discrimination in various forms; sales below costs; and the granting of rebates and discounts not made available to all buyers. It differs from the Robinson-Patman Act in that the state statute proscribes discrimination among different geographic localities only—it does not prohibit discrimination among different individual purchasers.

In *Plotkin v. Tanners Vacuums* (1975) 53 Cal.App.3d 454, 125 Cal.Rptr. 697, the holding stated that the intent of the legislature was to discourage practices that injure the seller's (*i.e.* Gallo's) competitors; that the act operated at a *horizontal* level, and not a *vertical* level.

Significantly, Pappas does not explain how the evidence before the Court makes out a cause of action under this Act.

The motion of Gallo and McKesson for summary judgment as to Count IX is granted.

## Count X

In Count X, Pappas alleges unfair competition, stating simply that:

Gallo is and has, in fact, "engaged in acts of unfair competition in violation of ... California Business and Professions Code, Sections 17200, *et seq.*," and as a result they seek injunctive relief.

Pappas again argues that the two acts here involved, *i.e.*, failure to appoint Whitehall as a Gallo distributor, and the appointment of McKesson, are enough to bring them within the purview of the statute. Defendants argue that the statutory scheme clearly is designed to prohibit ongoing, continuing practices.

Pappas does not specify which particular sections it relies upon to establish the violation. As originally adopted Sections 17000 through 17200 specified a number of acts which were prohibited, the remedies for their violation, and procedural rules governing actions alleging such violations. Sections 17500 to 17930 govern the manner in which "representations" may be made to the public in a myriad of commercial activities.

Section 17200 (formerly a part of California Civil Code Section 3369) reads as follows:

> As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

Pappas' conclusionary statements that two actions are enough to support this cause of action are not supported by the authorities upon which they rely. Each California case cited by plaintiff or defendant clearly was concerned a continuing activity.

Whether Pappas would be entitled to damages, in addition to or in lieu of injunctive relief, is moot due to the fact that Gallo has demonstrated its entitlement to summary judgment on Count X.

## Count XI

Count XI charges Gallo and McKesson with violation of California's Cartwright Act.

All parties argue that:

1. California's Cartwright Act is based on Section 1 of the Sherman Act.

2. The California courts have developed a large body of precedent under the Cartwright Act which did not involve interstate commerce, but where federal precedent was deemed applicable.

Pappas' argument seems to suggest that although the federal antitrust issues may be decided against them, that *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 187 Cal.Rptr. 797 (1982) would give them separate standing under the Cartwright Act.

First, it should be noted that the in *Kolling* the court found that:

The Cartwright Act is patterned after the federal Sherman Anti-Trust Act (15 U.S.C. § 1, *et seq.*), so that decisions under the latter act are applicable to the former. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953,]. *Saxer v. Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 19, 126 Cal.Rptr. 327.)

*Kolling v. Dow Jones & Co., supra,* at 717, 187 Cal.Rptr. at 802.

Second, it should be noted that the Court found sufficient evidence to support a finding that Kolling's termination was based in part on improper antitrust motives by Dow Jones, *i.e.,* price fixing. Pappas has failed to supply evidence of any such illegal motive in this case.

### Count XII

■ Count XII seeks punitive damages. Pappas' entire argument in support of their entitlement to punitive damages consists of the following two paragraphs:

Gallo's Motion for Summary Judgment must be denied with respect to Count XII of the Amended Complaint. There is evidence from which the Court may infer that Gallo is and has been guilty of oppression, fraud or malice, thereby entitling Pappas to an award of exemplary damages under Section 3294 of the California Civil Code.

Pappas has established that it is entitled to proceed to trial on the claims alleged in its Amended Complaint. It would be premature to decide now, prior to trial, that Pappas is not entitled to an award of exemplary damages. That determination should be made when all the evidence is in and when the trier of fact has had an opportunity to observe the demeanor of the witnesses.

Pappas' counsel does not identify any evidence which would allow the trier of fact to draw the necessary inferences of malice and fraud to support an award of punitive damages. Suffice it to say, in considering the specific references to exhibits, depositions, transcripts, affidavits, etc., the Court finds no such evidence.

Gallo's motion for summary judgment as to Count XII is granted.